**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SEPARATION OF HINDUISM FROM OUR SCHOOLS, an unincorporated association; CIVIL LIBERTIES FOR URBAN BELIEVERS, an unincorporated association; AMONTAE WILLIAMS, individually and as a representative for all similarly situated persons; DASIA SKINNER, individually and as a representative for all similarly situated persons; and DARRYL WILLIAMS, individually and as a representative for all similarly situated persons,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Case No. 20 C 4540** |
| **vs.** | ) ) | |
| **CHICAGO PUBLIC SCHOOLS, City of Chicago School District #299; THE DAVID LYNCH FOUNDATION; and the UNIVERSITY OF CHICAGO,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

From 2015 to 2019, students and teachers in a handful of Chicago's public schools participated in a program called "Quiet Time." The plaintiffs in this case allege that Quiet Time included elements of both the Hindu religion and a practice known as Transcendental Meditation. In this suit, the plaintiffs assert two claims. Under 42 U.S.C. § 1983, they contend that the use of the Quiet Time program in Chicago's public schools violates both the Establishment Clause and the Free Exercise Clause of the

federal constitution.  And they bring a claim under state law, alleging that the use of the program in schools violates the Illinois Religious Freedom Restoration Act.

The defendants argue the complaint must be dismissed because: (1) the claims are non-justiciable, as the plaintiffs do not have standing to sue; (2) the claims are time-barred; and (3) the plaintiffs have failed to state claims upon which relief may be granted.

## Background

The following facts are drawn from the plaintiffs' amended complaint.  Because the Court is considering a motion to dismiss, it accepts as true the complaint's well-pleaded factual allegations.  *Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). That said, the Court "offer[s] no opinion on the ultimate merits," recognizing that "further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

## A.    The parties

There are five plaintiffs.  The first, Amontae Williams, is a former Chicago Public Schools (CPS) student who graduated from a school that hosted the Quiet Time program.  His father, Darryl Williams, is also a plaintiff.  Dasia Skinner is the third; she is a substitute teacher who taught at two Chicago public schools that hosted Quiet Time. The fourth and fifth plaintiffs are Separation of Hinduism from our Schools (SHOS) and Civil Liberties for Urban Believers (CLUB), two unincorporated associations with alleged interests in this case.

There are three defendants.  First is the David Lynch Foundation (DLF).  DLF's mission is the promotion and "widespread implementation of . . . Transcendental

Meditation."  Amd. Compl. ¶ 16.  To that end, DLF promotes Transcendental Meditation in schools through the Quiet Time program.  According to its website, DLF believes that Quiet Time "improv[es] academic performance and reduc[es] stress and violence" and cites evidence it believes supports its conclusion.  *Id.* at Ex. H.  "[H]undreds of public, private, and charter schools worldwide" have adopted Quiet Time as a result of DLF's efforts.  *Id.*  At one point, some of those schools were Chicago public schools.

According to the plaintiffs, the story of how Quiet Time came to be in Chicago's public schools began when DLF approached the second defendant, the University of Chicago.  The University is home to a consortium of research centers, called the Urban Labs, that "work[ ] 'to address challenges across five key dimensions of urban life'" including in education, health, and poverty.  *Id.* ¶ 17.  The University's Urban Labs "partner[ ] with civic and community leaders to identify, test, and help scale the programs and policies with the greatest potential to improve human lives."  *Id.*  At some point—the plaintiffs do not say when or why—DLF asked the University to be its research partner in a project that would involve implementing Quiet Time in certain Chicago public schools.  The University agreed.

Together the organizations sought approval from the last defendant, the Board of Education of the City of Chicago, which agreed to their proposal.[1]  According to the plaintiffs, the three defendants "worked collaboratively" to create parameters for Quiet Time's implementation in handful of the Board's schools and to implement the program within those schools.  *See id.* ¶¶ 23, 24.

---

[1] The plaintiffs' complaint incorrectly refers to the Board as "Chicago Public Schools."

3

**B.     The Quiet Time program**

Quiet Time took place during the school day and used space on school property. The program consisted of two 15-mintues meditation sessions—one in the morning and one in the afternoon—on every school day.  Sessions were typically led by Transcendental Meditation instructors who were certified by the Maharishi Foundation, a not-for-profit organization founded by Maharishi Mahesh Yogi, who developed the Transcendental Meditation technique.  When a Transcendental Meditation instructor was unavailable, CPS teachers were expected to lead meditation sessions.

Though defendants represented Quiet Time as non-religious in nature, as discussed below, the plaintiffs allege that the program had what they call "hidden religious" elements.  *See id*. ¶ 61, 63.

**1.     Puja initiation ceremony**

Quiet Time required participation in a "Puja" initiation ceremony.  Students were expected to "actively participate" in the ceremony.  *Id*. ¶ 32.  The Puja ceremonies were led by the Transcendental Meditation instructors.  During the ceremony, items were placed around a picture of Guru Dev, a former teacher of the Maharishi.  After the items were "presented" to the picture of Guru Dev, the Transcendental Meditation instructor chanted in Sanskrit and performed rehearsed movements.  *Id*. ¶ 30.  Translated into English, the words chanted in Sanskrit included "statements recognizing the power possessed by various Hindu deities and invitations to those same Hindu deities to channel their powers through those in attendance."  *Id*. ¶ 37.

**2.     Mantras**

When students were taught to meditate, they were instructed to "silently repeat"

4

an assigned mantra to assist them in their meditation.  *Id.* ¶¶ 41, 42, 49.  Students were

told to use only the mantra that had been assigned to them by their Transcendental

Meditation instructor.  The mantras were in Sanskrit.  Though students were taught how

to pronounce their mantra, they were not told the meaning of the words.  Instead, the

Transcendental Meditation instructors told students that the mantras were "meaningless

sounds."  *Id.* ¶ 45.  The plaintiffs assert that, to the contrary, the mantras "honor or

reference specific Hindu deities."  *Id.* ¶ 47.

### 3.    Secretive nature

Students in Quiet Time were asked to keep to an oath of secrecy.  The oath

required them to keep their experience in the program secret from others, including their

parents, guardians, and other students.   Instructors explained that failing to keep this

"oath of secrecy" would make the practice of Transcendental Meditation "wholly

ineffective."  *Id.* ¶ 55.

### 4.    Mediation Sessions

To indicate the beginning of a meditation session, the Transcendental Meditation

instructor rang a small handheld bell known as a "Ghanta."  The plaintiffs allege that

these "ritual bell[s]" are commonly used in Hindu religious practices and that, in

Hinduism, bells are "used to indicate a desire to interact with a deity and to prepare a

listener's mind [for] said interaction."  *Id.* ¶ 61.

## C.    Plaintiff-specific allegations

### 1.    Amontae Williams

Amontae Williams alleges that he was "coerced . . . to engage in religious

practices and rituals that are based in Hinduism, in violation of his rights."  *Id.* ¶ 76.  At

the time the relevant events occurred, Amontae was a congregant of a Christian church and was raised within the Christian faith.  He attended Bogan Computer Technical High School in Chicago until he graduated in spring of 2019.  Bogan was one of the schools that hosted Quiet Time.

During his senior year, Amontae felt coerced to participate in Quiet Time by school administrators, teachers, and the Transcendental Meditation instructors; he discussed this pressure to participate with his classmates who felt similarly.  Amontae also felt discomfort when participating in Quiet Time and wished to stop participating in it; he also discussed this with his classmates, some of whom felt the same.  When he tried to ask Transcendental Meditation instructors to explain the meaning or significance of aspects of Quiet Time (e.g., the Puja ceremony or the mantra), he was "repeatedly rebuffed."  *Id.* ¶ 75.  While participating in Quiet Time, Amontae had a traumatic experience that he describes as "like [an] exposure to negative spiritual influences, contrary to his religious upbringing."  *Id.* ¶ 74.

After he learned of the "hidden religious nature" of Quiet Time, Amontae shared what he learned with his classmates.  *Id.* ¶ 71.  When CPS officials learned what Amontae was sharing, he was sent to the principal's office on two occasions.  The first time he was sent to the principal's office, Amontae met with the school's Operations and Climate and Culture Manager, Sharon Dixon.  She told him to stop telling other students that Quiet Time involved religious practices or Hindu rituals.  The second time he was sent to the office, Amontae met with Dixon again.  This time, Dixon threatened to suspend Amontae if he continued to tell students about any alleged connection between Quiet Time and Hinduism.

6

Amontae's sworn declaration—which is incorporated by reference in the complaint—largely matches the above allegations.

### 2. Dasia Skinner

Dasia Skinner claims she was "coerced . . . to facilitate religious practices and rituals that are based in Hinduism, in violation of her rights." *Id.* ¶ 84. Skinner is an "active participant" in a Christian Church and "strongly identifies with the Christian faith." *Id.* ¶ 79. She was a substitute teacher who accepted assignments at Bogan and at Gage Park High School in 2018 and 2019. At the time the relevant events occurred, Gage Park, like Bogan, hosted Quiet Time.

After learning about Quiet Time and hearing some students' concerns, Skinner "conducted her own investigation" into the origins of the Transcendental Meditation. *Id.* ¶ 82. After speaking with students, Transcendental Meditation instructors, and doing her own research, Skinner determined that the practice is built upon Hindu religious practice and rituals. Skinner alleges that her personal faith and religious practices are inconsistent with Hinduism.

Skinner further alleges that she felt "pressured" by CPS administrators to support Quiet Time and to encourage students to participate in the program. *Id.* ¶ 80. She also says she felt "pressured to evaluate students based upon their participation" in the program. *Id.* ¶ 81. Notably, however, neither Skinner's allegations in the complaint nor her declaration—which is incorporated by reference in the complaint—state that Skinner evaluated students or participated in any capacity in the Quiet Time program.

### 3. Darryl Williams

Darryl Williams is Amontae's father. He alleges that the defendants, "by

facilitating religious practices and rituals that are based in Hinduism, interfered with [his] parental right to direct the religious education of his . . . child." *Id.* ¶ 92.

Darryl attends a Christian Church and strongly identifies with the Christian faith. He "has gone to great lengths" to dictate his children's religious education. *Id.* ¶ 88. When Darryl first learned of the program and its alleged connections to Hinduism, he was "angered by the intrusion into his child's religious education and coercion toward a belief system" he believed was inconsistent with Christianity. *Id.* ¶ 90. He was also angered to see the use of public funds and resources go toward supporting Quiet Time, Hindu beliefs, and the practice of Transcendental Meditation.

Darryl's sworn declaration—which is incorporated by reference in the complaint—largely matches the above allegations.

### 4. SHOS and CLUB

SHOS is an "unincorporated association" of students, their parents, and others, whose goal is to "remove Hindu-based religious practices, concealed as 'Transcendental Meditation,'" from public schools. *Id.* ¶ 10. CLUB is an "unincorporated association of churches and ministries" that is "organized and directed by the Holy Spirit." *Id.* ¶ 11. Its goal is to protect religious civil liberties. In its declaration—which is incorporated by reference in the complaint—CLUB states that "its churches and ministries have many member families with children who have been enrolled, are currently enrolled or will be enrolled in CPS in the future." CLUB Decl. ¶ 4.

### Discussion

The defendants challenge each plaintiff's standing to bring suit. To the extent the defendants seek dismissal for lack of standing, those challenges are properly viewed as

motions to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). When reviewing a challenge to subject matter jurisdiction, "the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

In a facial challenge to subject matter jurisdiction, the defendant argues that the plaintiff has insufficiently alleged a basis for subject matter jurisdiction. *Id.* (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)). Because the plaintiff is the party who invoked federal jurisdiction, when faced with a facial challenge, he "bears the burden of establishing the required elements of standing." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)

Conversely, in a factual challenge—"where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction"—district courts look past "the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444 (internal quotation marks omitted). Plaintiffs undergoing a factual challenge to standing must show their standing exists by a preponderance of the evidence. *See Kathrein v. City of Evanston*, 636 F.3d 906, 914 (7th Cir. 2011).

The defendants also challenge the sufficiency of the plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). Dismissal under Rule 12(b)(6) is proper if a complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss the complaint must state a claim for relief that

is plausible on its face." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (internal quotation marks omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (internal quotation marks omitted).

## A. Rule 12(b)(1) challenges

Both the Board and DLF assert that none of the plaintiffs has standing to bring this suit. The Board adopts DLF's argument and the University adopts both arguments. The difference between the defendants' arguments is that the Board offers a facial challenge to the plaintiffs' standing, and DLF has advanced a factual challenge to the plaintiffs' standing.

### 1. Facial challenge to standing

The Board argues that none of the individual plaintiffs (the Williamses or Skinner) can establish standing because they have failed to plead an injury in fact. It also argues that the organizational plaintiffs do not have standing to sue in their representational capacity.

To bring suit in federal courts, a plaintiff must meet the "irreducible constitutional minimum of standing." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, a plaintiff must demonstrate that: (1) he "has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) his "injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." *Silha*, 807 F.3d 173 (internal quotation marks

omitted).

In considering a facial challenge to subject matter jurisdiction, the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff[s]." *Silha*, 807 F.3d at 173. As noted earlier, the plaintiffs have the burden of establishing that they meet the requirements for standing. *See Disability Rts. Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008). The Court considers each plaintiff's standing to sue individually.

### a. Amontae Williams

At the outset, the Board argues that Amontae cannot establish standing to assert a claim for violation of the Establishment Clause because he has not alleged a concrete injury. In the Board's telling, Amontae's injury is only psychological, and a "psychology injury is insufficient to constitute an injury in fact under the Establishment Clause." Bd.'s Br. at 7 (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)). The Board is wrong.

"The concept of a concrete injury is particularly elusive in the Establishment Clause context because the Establishment Clause is primarily aimed at protecting noneconomic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014) (alterations accepted) (internal quotation marks omitted). That said, the rule is that "a plaintiff cannot establish standing based *solely on being offended* by the government's alleged violation of the Establishment Clause," not that a plaintiff may not base standing on psychological injury *at all*. *See id.* (emphasis added). To be specific, "[n]either psychological harm produced by observation of conduct with which one disagrees nor

offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury." *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015) (internal quotation marks omitted).

Contrary to the Board's argument, the Supreme Court in *Valley Forge* did not hold that psychological injuries were per se insufficient. *See* 454 U.S. at 485. Instead, the Court held that the plaintiffs lacked standing because they failed "to identify any personal injury suffered by them *as a consequence* of the alleged [violation of the Establishment Clause], other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.*; *see also Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 807–08 (7th Cir. 2011) ("The 'psychological consequence presumably produced by observation of conduct with which one disagrees' is not an 'injury' for the purpose of standing." (citing *Valley Forge,* 454 U.S. at 485)).

In this case, however, even if Amontae's injury could be characterized as only psychological, that injury would have been produced because of his direct, allegedly coerced participation in Quiet Time, not by his mere observation of the actions of others. He alleges that he was coerced to participate in Quiet Time's daily components, that he was assigned a mantra, and that he was pressured to take part in a Puja ceremony. Importantly, the psychological injury the Board claims is insufficient—Amontae's "exposure to negative spiritual influences," an experience he describes as "almost like a possession"—is alleged to have occurred while he was meditating as part of the program. *See* Amd. Compl. ¶ 74; A. Williams Decl. ¶ 16–18. In all, Amontae claims to have suffered a direct, personal injury by coerced participation in what he contends

were religious ceremonies. His allegations are therefore far more substantial and far more personal than just "a feeling of alienation" due to government action or a "a desire to have public officials comply with [his view of] the Constitution." *See Obama*, 641 F.3d at 807.

Next, the Board argues that Amontae cannot establish standing under the Free Exercise Clause because his allegations about Christianity are in the past tense and "speak only to previously attending church with his family and how he was raised." Bd.'s Br. at 8. To have standing under the Free Exercise Clause, a plaintiff must allege the infringement of his religious freedoms. *See McGowan v. Maryland*, 366 U.S. 420, 429 (1961) (determining plaintiffs lacked standing because they did not "allege any infringement of their own religious freedoms"); *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 225 n.9 (1963) ("[T]he requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed.").

Looking to the complaint, Amontae states that he "regularly attended a Christian church with his family and was raised within the Christian faith." Amd. Compl. ¶ 67. He explains that he was "coerced" into participating in the Quiet Program and that when he sought to tell students about his suspicions regarding the program's supposed religious foundations, he was reprimanded and threatened with suspension. And he describes the possession-like experience he had as contrary to his "religious upbringing." *Id.* ¶ 74. Thus, he states what his religious beliefs are and how he contends they were infringed upon. *See McGowan*, 366 at 429.

Even if Amontae were unable to establish any religious beliefs, he would still

have standing under the Free Exercise Clause, as the guarantees of the Religion Clauses are not limited to only those Americans who practice a religion. "[T]he government may not favor one religion over another, *or religion over irreligion*, religious choice being the prerogative of individuals under the Free Exercise Clause." *McCreary Cty. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 875–76 (2005) (emphasis added); *see also id.* at 884 ("The Religion Clauses . . . protect adherents of all religions, as well as those who believe in no religion at all.") (O'Connor, J., concurring). Relatedly, the Seventh Circuit has said that "[a]theism is a school of thought that takes a position on religion, the existence and importance of a supreme being, and a code of ethics, and it is thus a belief system that is protected by the Free Exercise and Establishment Clauses." *Kaufman v. Pugh*, 733 F.3d 692, 697 (7th Cir. 2013) (emphasis added) (internal quotation marks omitted). Again, Amontae's allegations at bottom are that his school compelled him to participate in religious activity that was against his beliefs. That would be enough to establish standing under the Free Exercise Clause.

In sum, Amontae has stated an injury in fact under both the Establishment and Free Exercise clauses.

### b. Darryl Williams

Darryl Williams—not through his son but on his own—also asserts claims in this case. The Board recognizes, as it must, that parents may have standing under both the Establishment and Free Exercise clauses to challenge violations if they are affected by the government action. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972). Nevertheless, the Board asserts that Darryl should not be able to assert his claims given that his son was a legal adult for some of the relevant period and courts are "reluctant to extend the

14

constitutional protections afforded the parent-child relationship to cases involving adult children." *See Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005).[2]  The Board proposes, therefore, that the Court either find that Darryl lacks standing entirely or limit Darryl's claims to those events that took place before his son's eighteenth birthday.

Darryl seemingly concedes that his claims may not encompass events that occurred beyond Amontae's eighteenth birthday.  Nevertheless, he argues that he has standing as a taxpayer and therefore may still pursue his claims regardless of his son's age.

First, the Court considers Darryl's standing as a parent.  Darryl has said that he went to "great lengths" to dictate his children's religious education.  Amd. Compl. ¶ 88. He was "angered by the intrusion into his child's religious education and coercion toward a belief system" that he believed was inconsistent with Christianity.  *Id.* ¶ 90. Since *Yoder*, "[c]ourts have recognized that parents have standing as a result of their right to direct the religious training of their children."  *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 683 (7th Cir. 1994) (citing cases).  The Seventh Circuit has held that parents have standing to raise an Establishment Clause claim "because the impermissible establishment of religion might inhibit their right to direct the religious training of their children."  *Id.* at 684.  Parents have standing to sue under the Free Exercise Clause "only if they claim infringement of their personal religious freedom" and when they allege interference with their "direct, personal right to direct their children's

---

[2] It is worth noting that this case is not entirely on point, as it considered parents' constitutional right to recover for the loss of society and companionship of their son. *See Russ*, 414 F.3d 789–90.

religious training." *Id.* (citing *McGowan*, 366 U.S. at 429).

The Court has not been able to identify any case in which a parent of an adult child has been able to assert claims alleging interference with that child's religious upbringing. And at least one circuit has said that parents only have "the religious freedom . . . to control the religious upbringing and training of their minor children." *See Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1531 (9th Cir. 1985). This background—along with various courts' reluctance "to extend the constitutional protections afforded the parent-child relationship to cases involving adult children"— convinces the Court that a parent may not pursue claims alleging interference with a child's religious education once that child reaches the age of majority. *See Russ*, 414 F.3d at 788 (citing cases from the First, Third, and D.C. Circuits). Therefore, though the Court determines that Darryl has standing as a parent under both the Establishment and Free Exercise clauses, he has standing only to the extent his claims involve events that took place before his son's eighteenth birthday.

Next, the Court considers Darryl's taxpayer standing argument. In their response brief, the plaintiffs argue that Darryl has taxpayer standing to "challenge the ways in which taxpayer-funded space and resources were used in violation of the Establishment Clause." Pl.'s Resp. to Bd. at 8. That's all well and good, but the plaintiffs never state which form of taxpayer standing Darryl is alleging. "[S]ince its first pronouncements on taxpayer standing, the Supreme Court has distinguished between . . . federal and state taxpayers . . . and municipal taxpayers." *See Hinrichs v. Speaker of House of Representatives of Ind. Gen. Assembly*, 506 F.3d 584, 600 n.9 (7th Cir. 2007). Therefore, the Court will consider each.

16

First, the Court considers federal taxpayer standing, for which the Supreme Court has erected a general bar. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347 (2006). The general prohibition against federal taxpayer standing exists because a taxpayer's interest in any government action, as a taxpayer, "is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923).

In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court established an exception to the general rule announced in *Frothingham*: "a taxpayer will have standing . . . when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power." *Id.* at 105–06. To properly assert standing as a taxpayer, a plaintiff must:

> First . . . establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of [Article I, section 8], of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute . . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by [Article I , section 8].

*Id.* at 102–03.

Darryl has not properly asserted a basis for federal taxpayer standing. The

complaint includes two allegations related to the use of public funds. First, it reflects that Darryl was "angered by the use of public funds and resources to create environments within public schools where Hindu beliefs and the practice of 'Transcendental Meditation' were being endorsed." Amd. Compl. ¶ 91. Also included among the complaint's allegations is that "CPS' practice causes taxpayer funds to support the practice of 'Transcendental Meditation' and the propagation of the religious views specific to 'Transcendental Meditation.'" Amd. Compl. ¶ 111. Neither of these allegations is sufficient to assert federal taxpayer standing because Darryl is not challenging "a [federal] law authorizing the use of federal funds," a law he believes violates the Establishment Clause. *See Hein v. Freedom From Religion Found.*, *Inc.*, 551 U.S. 587, 593 (2007). *"Flast* did not . . . create an exception to the taxpayer-standing bar for all Establishment Clause cases." *Laskowski v. Spellings*, 546 F.3d 822, 826 (7th Cir. 2008). Instead, federal taxpayer standing exists "[o]nly when a taxpayer challenges a specific congressional appropriation—not a government program or activity funded from general appropriations—will the link to the Article 1, Section 8 taxing and spending power be sufficient to support standing under *Flast*." *Id.* In this case, Darryl is simply challenging the purported distribution of funds from the Board's overall budget to the Quiet Time program. That is not enough to confer federal taxpayer standing.

Darryl is also ineligible for state taxpayer standing. A plaintiff who wishes to establish state taxpayer standing is held to the same requirements as a federal taxpayer. *Hinrichs*, 506 F.3d at 598. State taxpayers too "must establish the requisite nexus between their status and the challenged enactment in order to meet the test

articulated in *Flast*." *Id.* Darryl has not even alleged that there is an unconstitutional state appropriation at issue here, not to mention alleging a nexus between his status as a taxpayer and a state appropriation.

As with federal and state taxpayer standing, so too with municipal taxpayer standing. Municipal taxpayer is subject to less exacting requirements than state or federal taxpayer standing. *Hinrichs*, 506 F.3d at 600 n.9. To be eligible for municipal taxpayer standing, the plaintiff: (1) must be a taxpayer of the municipality he wishes to sue and (2) "must establish that the municipality has spent tax revenues on the allegedly illegal action." *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 734 (7th Cir. 2020). To meet that second requirement, the plaintiff must bring a 'good-faith pocketbook action.'" *Id.* In other words, the plaintiff must show that he "has 'the requisite financial interest that is, or is threatened to be, injured by' the municipality's illegal conduct." *Id.*; *see also Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996) ("[M]unicipal taxpayers have standing when they object to a disbursement of funds occasioned solely by the alleged unconstitutional conduct. Municipal taxpayer status does not confer standing absent some allegation by the plaintiffs of an illegal use of tax revenues.").

Darryl cannot meet the second requirement for municipal taxpayer standing, as he has not shown that the Board "has actually expended funds *on the allegedly illegal elements* of the disputed practice." *Id.* at 735. In *Protect Our Parks,* the plaintiffs alleged that the illegal elements of the municipal expenditure—"the construction and operation of the Obama Presidential Center"—violated the public trust doctrine. *Id.* The Seventh Circuit determined that claim was insufficient to establish standing because it

was the Obama Foundation—rather than the City of Chicago—that would bear the cost of constructing and operating the Center. *Id.* Given that no municipal tax money was to be spent on the allegedly illegal activity, the plaintiffs' status as municipal taxpayers was irrelevant for standing purposes. *Id.*

In this case, Darryl does not assert that the Board expended municipal taxes on the allegedly unconstitutional elements of Quiet Time—e.g., the Puja initiation ceremony or the meditation sessions. Instead, he makes a more general claim: that the Board used public funds toward the program. But it is possible that—as in *Protect Our Parks*—the Board has not expended any funds on the purportedly unconstitutional elements of Quiet Time, but instead spent money on ancillary services, such as funds spent on school operations. *See id.* (determining that the City's expenditures toward "alteration and rerouting of roadways," "environmental remediation and utilities work," and "construction of athletic facilities" were not enough to establish municipal standing because the plaintiffs did not allege that those projects were illegal). Without more, the municipal-taxpayer route to standing is closed to Darryl.[3]

In sum, Darryl does not have taxpayer standing, but he has standing as a parent under both the Establishment and Free Exercise clauses, limited to the events that took place before his son's eighteenth birthday.

---

[3] In addition to arguing that Darryl, specifically, has taxpayer standing, the plaintiffs also argue that "the parents, teachers, and related faith community members" that are involved in this litigation are also eligible for taxpayer standing. Pl.'s Resp. to Bd. at 9–10. But the Court has not yet certified a class, so it is not clear who the parents (other than Darryl), teachers (other than Skinner), and faith community members are. Because this argument does not address the standing of any party currently before the Court, the Court need not address it.

20

### c. Skinner

The Board argues that Skinner lacks standing because she has neither alleged that she participated in the Quiet Time program nor explained how her proximity to those who did participate in the program was injurious to her religious beliefs. The plaintiffs assert that the Board's argument "ignores" Skinner's allegations in the complaint and in her declaration.

Skinner claims she was "coerced . . . to facilitate religious practices and rituals that are based in Hinduism, in violation of her rights." *Id.* ¶ 76. She further alleges that she felt "pressured" by CPS administrators to support Quiet Time and to encourage students to participate in the program. *Id.* ¶ 80. She also says she felt "pressured to evaluate students based upon their participation" in the program. *Id.* ¶ 81.

But neither her allegations in the complaint, nor those in her declaration, state that Skinner actually participated in Quiet Time in any capacity or that she ever actually evaluated students. In fact, everything of relevance conveyed in Skinner's complaint—the details of the Quiet Time program, students' experiences, and parents' reactions—comes secondhand from her conversations with students, parents, and Quiet Time instructors. She claims no direct involvement or even an attempt to pressure her to be involved in promoting or participating in the program.

It appears, therefore, that Skinner's injury consists only of the claimed "nonobservance of the Constitution" by others or the observation of conduct that did not conform with her religious beliefs—neither of which is "a species of injury in fact." *See Obama*, 641 F.3d at 808 (internal quotation marks omitted). Thus, she does not have standing to sue under the Establishment Clause because she has failed "to identify any

personal injury suffered by [her] *as a consequence* of the alleged constitutional error, other than the . . . consequence presumably produced by observation of conduct with which one disagrees." *See Valley Forge,* 454 U.S. at 485.

Moreover, Skinner has no standing under the Free Exercise Clause as she has not set out a viable claim of infringement of her religious beliefs sufficient to confer standing. Missing from her allegations is any description of how her mere proximity to students participating in Quiet Time would have inhibited her religious beliefs. That is a necessary component to establish her standing under the Free Exercise Clause. *See McGowan*, 366 U.S. at 429; *see also Harris v. McRae*, 448 U.S. 297, 320 (1980) (determining that some plaintiffs lacked standing to challenge the Hyde Amendment—which severely limits the use of federal funds to reimburse the cost of abortion—because even though they pled their deeply held religious beliefs, "they failed to allege either that they are or expect to be pregnant or that they are eligible to receive Medicaid").

Skinner's claims are therefore dismissed for lack of standing.

### d.    SHOS and CLUB

The Board's final standing argument is that neither SHOS nor CLUB has standing to sue. The Court agrees. The organizations do not plead that they, themselves, have been injured. *See, e.g., Disability Rts. Wis.,*, 522 F.3d at 800. Instead, they claim associational standing. An organization has associational standing—and is therefore able to file suit on behalf of its members—when "(1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims

22

asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Id.* at 801.

SHOS's only allegation in the complaint is that it is an "unincorporated association" of students, their parents, and others, whose goal is to "remove Hindu-based religious practices, concealed as 'Transcendental Meditation,'" from public schools. Amd. Compl. ¶ 10. That lonely allegation is not sufficient to establish that any of SHOS's members have sustained an injury and have standing to sue. Because it cannot meet the first requirement for associational standing, SHOS must be dismissed from this suit for lack of standing.

CLUB also fails to establish associational standing. Like SHOS, CLUB is an "unincorporated association of churches and ministries." *Id.* ¶ 11. In its declaration, CLUB states that "its churches and ministries have many member families with children who have been enrolled, are currently enrolled or will be enrolled in CPS in the future." CLUB Decl. ¶ 4. But CLUB does not allege that any of its member-groups have students who attended schools that hosted Quiet Time or even took part in the program. Moreover, CLUB pleads that it first heard about Quiet Time from plaintiffs' counsel. Thus, like SHOS, CLUB fails to establish that any of its members have sustained an injury and have standing to sue. CLUB is dismissed from this suit.

### 2. Factual challenge to standing

DLF asserts a factual challenge to subject matter jurisdiction, which at this point the Court need consider only with regard to the Williamses. Though "a facial attack does not challenge the alleged facts themselves . . . . a factual attack does [by] testing the existence of the jurisdictional facts underlying the allegations." *Bazile v. Fin. Sys. of*

*Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) (citation omitted). And although "a plaintiff undergoing only a facial attack enjoys treatment of her allegations as true," a plaintiff undergoing a factual attack does not have that benefit. *Id.* Instead, courts considering factual attacks to subject matter jurisdiction "may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." *Id.* Furthermore, once a factual attack is launched, "the plaintiff must support each controverted element of standing with . . . a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Id.* at 278 (citations omitted).

Like the Board, DLF mainly asserts that the plaintiffs have not met the injury-in-fact requirement. Specifically, DLF claims that even if the plaintiffs' complaint is formally sufficient, they lack standing to pursue the injunctive relief, declaratory relief, nominal damages, and compensatory damages that they request. *See Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 890 (7th Cir. 2013) ("[A] plaintiff must demonstrate standing for each form of relief sought."). The Court considers each argument in turn.

### a.    Injunctive and declaratory relief

DLF first argues that the Williamses lack standing to pursue either injunctive or declaratory relief because the Board discontinued its partnership with DLF and ended the operation of Quiet Time in its schools more than a year before the complaint was filed. The defendants have submitted affidavits and other evidence to support that the following: (1) the Quiet Time program was discontinued in CPS after the 2018-2019 school year; and (2) there are no present plans to re-instate the program in CPS. The plaintiffs explain that they have standing to pursue injunctive relief because DLF has

communicated that it hopes to one day resume the program in CPS should conditions allow it.

To demonstrate injury in fact, a "plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001). Neither an "abstract injury," "past exposure to illegal conduct," nor speculation that a plaintiff "may suffer the same injury at some time in the future," will suffice in demonstrating "a present case or controversy regarding prospective equitable relief." *See id.* (internal quotation marks omitted). Instead, the Supreme Court has said that "to invoke Article III jurisdiction a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some direct injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000) (citing *Adarand Constructors, Inc. v. Pena*, 510 U.S. 200, 210–11 (1995); *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)).

The Williamses do not have standing to pursue either injunctive or declaratory relief because they have not established any likelihood of future injury. Any assertion that either Williams is likely to be injured in the future is "purely speculative," *see Tobin for Governor*, 268 F.3d at 528, as neither plaintiff has demonstrated "a significant likelihood and immediacy of sustaining some direct injury." *See Sierakowski*, 223 F.3d at 443. The parties do not dispute that the program ended with the conclusion of the 2018-2019 school year. CPS clearly and unequivocally communicated to school principals that it had "made a programmatic decision to not continue the program with DLF" and that "[DLF] will no longer operate the Quiet Time program in CPS." Dkt. no. 19–2 at 1.

25

It is true that a DLF official expressed "hop[e] that the current impasse with CPS leadership . . . will shift in time, and that [DLF] will have the opportunity to resume the program for schools that recognize its value." Dkt. no. 19–2 at 2. But that expression of hope lacks any of the indicia necessary to confer standing to seek injunctive relief. *See Sierakowski*, 223 F.3d at 443. And even if there were a real and immediate threat of future injury, it is not clear how either Amontae or Darryl Williams would be subjected to a risk of harm, as Amontae has already graduated and is no longer a CPS student. *See, e.g., Roberts v. Madigan*, 921 F.2d 1047, 1052 (10th Cir. 1990) (concluding certain plaintiffs lacked standing to seek injunctive relief because there was only a "speculative likelihood" that their children would be placed in the classroom in which the alleged Establishment Clause violations occurred).

In sum, the plaintiffs cannot demonstrate a realistic threat of future harm. They therefore "lack[ ] the requisite personal stake in the outcome of this litigation to establish standing to seek" either injunctive or declaratory relief. *See Sierakowski*, 223 F.3d at 444 (citing *Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.")).[4]

---

[4]The Board also argues that the plaintiffs' request for injunctive and declaratory relief is moot. Because no plaintiff has standing to seek injunctive or declaratory relief, the Court need not consider the question of mootness. That said, the court rejects the Board's assertion that the case must be dismissed if the plaintiffs cannot pursue equitable relief, as "we must trudge on," and consider the plaintiffs' standing to seek damages. *See Brandt v. Bd. of Educ. of Chicago*, 480 F.3d 460, 465 (7th Cir. 2007).

### b. Nominal and compensatory damages

DLF argues that the plaintiffs may not seek compensatory damages because their allegations are insufficient to establish injury in fact for Article III standing. The Court has determined, however, that both Amontae and Darryl Williams have sufficiently alleged an injury. Specifically, DLF argues that Amontae cannot have standing because he only alleges an emotional harm, a purely psychological injury. That argument is unavailing for the reasons already stated. *See supra* at 11–14. Regarding Darryl, DLF does not make a specific argument regarding his ability to recover compensatory damages. Even if it did, Darryl has standing as a parent under both the Establishment and Free Exercise clauses to claim infringement with his right to dictate Amontae's religious upbringing. *See supra* at 14–16.

DLF also asserts that the plaintiffs may not recover nominal damages, arguing that nominal damages do not "confer jurisdiction that does not otherwise exist when the allegedly unconstitutional activity ceased prior to the filing of the lawsuit." DLF's Br. at 6 (citing *Freedom From Religion Found., Inc. v. City of Green Bay*, 581 F. Supp. 2d 1019 (E.D. Wis. 2008)). This is of no consequence, however, because the Court has concluded that the Williamses have standing to recover compensatory damages.

That said, it is worth noting that even if the Williamses were seeking only nominal damages, they would have standing to sue. In a case decided after the parties' briefs were submitted, the Supreme Court held that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

27

Because the Williamses have sufficiently alleged both injury in fact and traceability, a request for nominal damages would satisfy the redressability element of standing here.

In summary, the Williamses have standing to pursue both nominal and compensatory damages.

## B.    Rule 12(b)(6) challenges

### 1.    Statute of limitations

The Board contends that many of the plaintiffs' claims are time-barred and must be dismissed.  Specifically, the Board asserts that the plaintiffs may not pursue under section 1983 any First Amendment claims that accrued prior to August 3, 2018. Regarding the Illinois Religious Freedom Restoration Act (IRFRA), the Board urges dismissal of that claim on the ground that the one-year statute of limitations has run.

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations."  *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009).  However, "when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness," a court may dismiss the complaint.  *Id.* at 674–75; *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) ("[T]he statute of limitations may be raised in a motion to dismiss if 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'").

### a.    Section 1983 claims

The limitations period for 42 U.S.C. § 1983 claims is borrowed from the state statute of limitations for personal injury claims.  *Mitchell v. Donchin*, 286 F.3d 447, 450 n.1 (7th Cir. 2002).  The statute of limitations "applicable to *all* [section] 1983 claims

28

brought in Illinois is two years, as provided in 735 ILCS 5/13–202." *Woods v. Ill. Dep't of Child. & Fam. Servs.*, 710 F.3d 762, 768 (7th Cir. 2013). A "claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31; AFL-CIO*, 942 F.3d 352, 361 (7th Cir. 2019) (internal quotation marks omitted). "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cancer Found., Inc.*, 559 F.3d at 674. To determine the accrual date, courts must "identify the injury" and then "determine when the plaintiff could have sued for that injury." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011).

The Board argues that because the plaintiffs filed suit on August 3, 2020, they may not allege injuries that occurred with the operation of the Quiet Time program in the 2015-2016, 2016-2017, or 2017-2018 school years, as those injuries occurred more than two-years before the date of filing. The plaintiffs contend that they may assert injuries from school years before 2018-2019 on the ground that the Board's implementation of the Quiet Time program may be considered a "continuing violation of the First Amendment" and not just a series of discrete infringements. Pl.'s Resp. to Bd. at 4. The plaintiffs contend that the violation ended on October 25, 2019, when CPS announced both that the Quiet Time program would be discontinued and that it would not continue its partnership with DLF.

"A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v.*

29

*Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997). The Seventh Circuit has "applied the continuing violation doctrine when the plaintiff could not reasonably be expected to perceive the alleged violation before the limitations period has run," "when the violation only becomes apparent in light of later events," and "when the state actor has a policy or practice that brings with it a fresh violation each day." *Savory*, 469 F.3d at 672.

The Court concludes that it is inappropriate to adjudicate the defendants' limitations defense at this juncture. The plaintiffs' complaint—which doesn't have dates for most of the important events—lacks the information "necessary to determine if events beyond the limitations period are part of a continuing violation." *See Olympian Grp. LLC v. City of Markham*, No. 18 C 4919, 2020 WL 5820024, at *14 (N.D. Ill. Sept. 30, 2020) (citing *Brooks*, 578 F.3d at 579). In addition, the complaint does not explain— and does not have to explain—what actions the defendants took beyond the limitations period that the plaintiffs might be relying upon to claim a continuing violation. *See Olympian Grp. LLC*, 2020 WL 5820024, at *14. Without more information, the Court cannot determine that the plaintiffs could "reasonably have been expected to perceive an alleged violation that occurred more than two years before they filed suit" or if instead "the violation only became apparent in light of later events." *See id.* As the Court has indicated, the fact that the complaint lacks this information does not make it deficient; a complaint need not anticipate or overcome affirmative defenses. *See Cancer Found., Inc*, 559 F.3d at 674. The Court therefore declines to dismiss the complaint under Rule 12(b)(6) on this basis.

###### b. IRFRA claims

The plaintiffs also assert that the Board has violated IRFRA, which "requires even generally applicable laws that burden religion to be narrowly tailored to a compelling government interest." *See Cassell v. Snyders*, 990 F.3d 539, 551 (7th Cir. 2021); 775 ILCS 35/15. Under the Illinois Tort Immunity Act, "[n]o civil action . . . may be commenced in any court against a local entity . . . for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a).

Civil actions under the Tort Immunity Act "include[ ] any action, whether based upon the common law or statutes or Constitution of this State." 745 ILCS 10/8-101(c). Among those considered "local public entities" are school districts and school boards. 745 ILCS 10/1-206; *Albert v. Bd. of Educ. of Chi.*, 2014 IL App (1st) 123544, ¶ 52, 24 N.E.3d 28, 43 ("Under the Tort Immunity Act, a 'local public entity' includes school districts and all other local governmental bodies such as the Board."). And injuries under the Tort Immunity Act include "any injury alleged in a civil action, whether based upon the Constitution of the United States or the Constitution of the State of Illinois, and the statutes or common law of Illinois or of the United States." 745 ILCS 10/1-204. Accordingly, due to the Board's status as a governmental entity, the IRFRA claim against the Board is subject to a one-year statute of limitations. *Cf. Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (per curiam).

In Illinois "a cause of action accrues, and the limitations period begins to run, when the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199

Ill. 2d 325, 347, 770 N.E.2d 177, 192 (2002). "There is no requirement that a plaintiff must know the full extent of his or her injuries before suit must be brought under the applicable statute of limitations." *Clay v. Kuhl*, 189 Ill. 2d 603, 611, 727 N.E.2d 217, 222 (2000).

As with section 1983, the Board maintains that the plaintiffs' IRFRA claim is time-barred. The Board contends that the last day of school for the 2018-2019 school year—and therefore the last possible day for Amontae's injury to have occurred—was June 18, 2019. Because the plaintiffs filed their suit on August 3, 2020, the Board insists that the plaintiffs' IRFRA claim was filed beyond the one-year limitations period. *Id.* The plaintiffs repeat their continuing-violation-doctrine argument.

Under Illinois's continuing violation rule, "where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease." *Belleville Toyota, Inc.*, 199 Ill. 2d at 345, 770 N.E.2d at 190. "The Illinois Supreme Court has not adopted 'a continuing violation rule of general applicability in all tort cases, or . . . cases involving a statutory cause of action. Instead, the Court has carefully assessed the nature of a particular cause of action in order to determine whether the continuing violation rule should apply." *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005) (citation omitted). Actions that arise from a series of acts considered collectively may properly be considered continuing violations; actions that arise from individually identifiable wrongs are not applicable under Illinois's continuing violation rule. *Id.*

The Court concludes that dismissal of the plaintiffs' IRFRA claim under Rule 12(b)(6) would be inappropriate for the same reasons discussed with respect to their

section 1983 claims.  The plaintiffs allege that the implementation of the Quiet Time

program amounted to a continuous violation, but their complaint lacks (and, as

indicated, need not include) the information necessary to determine this definitively.

*See Olympian Grp. LLC*, 2020 WL 5820024, at *14.  The Court declines to dismiss the

complaint on this basis without the benefit of a complete factual record.  *See Sharma v.*

*Bd. of Trs. of Univ. of Ill.*, 404 F. Supp. 3d 1183, 1197 (N.D. Ill. 2019).  The plaintiffs

have not pleaded themselves "out of court by alleging facts sufficient to establish the

complaint's tardiness."  *See Cancer Found., Inc.*, 559 F.3d at 675.

### 2. Failure to state a claim

Each defendant challenges the sufficiency of the plaintiffs' complaint.  The Court

must accept as true the plaintiffs' well-pleaded factual allegations and it must draw all

reasonable inferences from those well-pleaded allegations in favor of the plaintiff.

*Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  "A complaint need not

contain detailed factual allegations, but must contain sufficient factual matter, accepted

as true, to state a claim for relief that is facially plausible.  The allegations must be

sufficient to raise a right to relief above the speculative level."  *O'Gorman v. City of*

*Chicago*, 777 F.3d 885, 888–89 (7th Cir. 2015) (citations omitted).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."

*Bissessur*, 581 F.3d at 602 (citation omitted).

### a. Section 1983 claims

A plaintiff asserting a section 1983 claim must allege that the defendants

deprived him of a right guaranteed by either the Constitution or laws of the United

States and that the defendants acted under color of state law. *L.P. v. Marian Cath. High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017). Here, the plaintiffs allege that the defendants violated, and conspired to violate, their rights under the First Amendment. Both the University and DLF argue that the plaintiffs have failed to sufficiently allege that they acted under color of state law.

The University and DLF are private, rather than public, actors. As such, they cannot be liable under section 1983 "unless something intervenes to give them 'state actor' status." *See id.* A private actor may become a state actor for purposes of section 1983 "when it is a willful participant in joint action with the State or its agents." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015) (alterations accepted) (internal quotation marks omitted). There are a few routes plaintiffs may take to demonstrate that a private actor has acted under state law; only two are alleged here —the conspiracy-based theory also known as the joint participation doctrine, and the public function test. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009).

"To establish [section] 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019). Under this test, "[bare] allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Id.* Under the public function test, "a private entity is a governmental actor when it is performing an action that is traditionally

the exclusive prerogative of the State." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 740 (7th Cir. 2015) (internal quotation marks omitted).

### i.  University of Chicago

The University claims that the plaintiffs have not adequately alleged a conspiracy between the Board and the University to deprive students of their constitutional rights. The Court agrees.  The plaintiffs have not alleged that the University was part of an understanding or agreement to deny the plaintiffs' constitutional rights or, "at the very least," that the University and the other defendants "shared a common, unconstitutional goal."  *See T.S. v. Twentieth Century Fox Television*, No. 16 C 8303, 2017 WL 4620841, at *3 (N.D. Ill. 2017) (St. Eve, J.) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 468 (7th Cir. 2016)).  Specifically, the plaintiffs do not allege that the University was aware of the purportedly unconstitutional behavior, that it agreed to participate in any unconstitutional behavior, or that it had any direct involvement in the unconstitutional behavior.  *Cf. Spiegel*, 916 F.3d at 617 (7th Cir. 2019) (dismissal was appropriate because the plaintiff failed to allege that the defendants, police officers and a private citizen, had agreed to investigate allegedly false police reports or that police officers were aware the reports were even false).

The plaintiffs allege that after DLF approached the University and proposed the Quiet Time program research project, the University "worked collaboratively" with the other defendants to "plan and conduct [the] research product," to "establish[ ] parameters for the Quiet Time program's implementation in CPS," and to implement the program within CPS.  Amd. Compl. ¶¶ 17, 21–24.  This does not add up to a sufficient allegation that the University agreed to promote Hinduism in classrooms in violation of

the plaintiffs' rights. Instead, the plaintiffs' allegations do not rise above the level of "mere suspicion that persons adverse to the plaintiff[s] had joined a conspiracy against" them, which is not enough to meet the higher bar required to allege a concerted unconstitutional effort. *See Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

The plaintiffs' counterarguments are unavailing, for two reasons. First, their brief overstates many of the allegations made in their complaint. For example, the complaint includes no allegation that the University "supervised" the Quiet Time program, nor does it include an allegation that the University brought the defendants "together and facilitated . . . the entire scheme," as the plaintiffs argue in their brief. *See* Pl.'s Resp. to Univ. at 4–6. Of course, when opposing a Rule 12(b)(6) motion, a plaintiff may expand upon the allegations in his complaint in his response brief, but only to the extent that the supplemental allegations are consistent with his complaint. *Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Here the plaintiffs' supplemental allegations are inconsistent with their complaint. They do not allege that the University had anything even approaching a supervisory role in Quiet Time, and they do not allege that the University facilitated the entire scheme. Rather, they allege only that the University agreed to DLF's proposal, was involved in jointly approaching CPS, and collaborated with the other defendants to establish the program.

Second, even if they were helpful in deciding this matter, the exhibit attached to the plaintiffs' response brief is outside of the pleadings and therefore may not be considered. *See* Pl.'s Resp. to Univ. at Ex. A.; *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) ("When ruling on a motion to dismiss, the

court may consider "documents attached to the complaint, documents central to the complaint and referred to in it, and information that is properly subject to judicial notice." (alterations accepted)).

In sum, the complaint does not sufficiently allege that the University acted in concert with the Board.  As such, the Court dismisses the plaintiffs' section 1983 claims against the University.[5]

### ii.    David Lynch Foundation

DLF first argues that to bring a section 1983 claim against a private entity a plaintiff must first allege that an official policy or custom of the entity caused the constitutional violation and was the moving force behind the violation.  *See Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).  That would be so in this case if the plaintiffs contended that DLF's liability is based on the employer-employee relationship between it and the Transcendental Meditation instructors.  *See id.* ("[J]ust as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees, a private corporation is not vicariously liable under [section]1983 for its employees' deprivations of others' civil rights." (citations omitted)).  But the plaintiffs have said that is not their theory of DLF's liability, so the Court will not consider this argument.

Next, DLF argues that the plaintiffs have failed to allege a conspiracy between it and the Board to deprive students of their constitutional rights.  In response, the plaintiffs rely on the same set of allegations as they did for the University and, for the

---

[5] With this result, the Court need not consider the University's arguments vis-à-vis the relief the plaintiffs may seek against the University through their section 1983 claims.

most part, the same set of arguments. For many of the same reasons described above with respect to the University, the plaintiffs have not sufficiently alleged that the Board and DLF reached an understanding or agreement to deny the plaintiffs' constitutional rights. *See T.S.*, 2017 WL 4620841, at *4. Again, it is not enough to allege that DLF "worked collaboratively" to "establish[ ] parameters for the Quiet Time program's implementation in CPS schools" or that it worked together with the co-defendants to implement the program within those schools. Amd. Compl. ¶¶ 17, 21–24. These assertions do not amount to alleging that DLF shared an unconstitutional goal with the Board. *See T.S.*, 2017 WL 4620841, at *4.

The result might be different if the plaintiffs alleged that, beyond their collaboration to establish the program in schools, both the Board and DLF were aware of the religious elements of Quiet Time and, even with that knowledge, agreed to go forward with the program understanding that it would infringe the plaintiffs' constitutional rights. *See Wilson*, 830 F.3d at 468. ("For a private actor to act under color of state law he must have had a meeting of the minds and thus reached an understanding with a state actor to deny plaintiffs a constitutional right." (internal quotation marks omitted)). As it stands, however, the Court can reasonably infer from the complaint only that DLF—as the provider—knew of the religious elements of Quiet Time. And "a private actor cannot unilaterally convert a state actor's legitimate activity into an illegal act, conferring both constitutional accountability on itself and liability on the state." *Id.* (alterations accepted) (internal quotations marks omitted).

Lastly, DLF argues that the plaintiffs have not plausibly alleged that it acted under color of law under the public function test. Here too, DLF has the better

argument. The relevant question "is not simply whether a private group is serving a public function." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (internal quotation marks omitted). Instead, as the Supreme Court has said, "the [appropriate] question is whether the function performed has been traditionally the *exclusive* prerogative of the State." *Id.* (internal quotation marks omitted). The problem for the plaintiffs is while there is no question that education is *a* public function, it is not an *exclusively* public function. *See id.* (holding that though "the education of maladjusted high school students is a public function," Massachusetts's choice to "provide services for such students at public expense . . . . in no way makes these services the exclusive province of the State."). Because education is not an exclusive public function in Chicago, this route to a color-of-law finding is blocked.

For these reasons, the Court dismisses the plaintiffs' section 1983 claims against DLF for failure to state a claim.

**b.** **IRFRA claims**

Finally, each of the defendants argues that the plaintiffs' IRFRA claims must be dismissed.

**i. DLF and the University**

IRFRA creates a right of action against a government, subdivision, or government official that "substantially burden[s] a person's exercise of religion." *See* 775 ILCS 35/15. Both the University and the DLF argue that they are not subject to liability under the IRFRA because they are not "governments" and the plaintiffs have failed to sufficiently allege that they acted under color of law. *See* 775 ILCS 35/5 ("'Government' includes a branch, department, agency, instrumentality, and official (or

39

other person acting under color of law) of the State of Illinois or a political subdivision of the State, including a home rule unit.").  The Court agrees.

Neither DLF nor the University is a " branch, department, agency, instrumentality, [or] official of the State of Illinois" or one its political subdivisions.  *See id.*  Thus, the only route the plaintiffs have to liability is to establish that DLF and the University acted "under color law," a phrase the statute does not define.  *See id.*  Though IRFRA is a state statute, because it is substantially identical to the federal Religious Freedom Restoration Act (RFRA), Illinois's courts find federal case law "instructive" in interpreting it.  *See People v. Latin Kings St. Gang*, 2019 IL App (2d) 180610-U ¶ 95 n.1; *see also Diggs v. Snyder*, 333 Ill. App. 3d 189, 194, 775 N.E.2d 40, 44 (2002) ("There is a paucity of cases involving [IRFRA], given its relatively recent passage.  We may therefore turn to federal cases for guidance, despite the fact that the federal statute . . . was held unconstitutional because it exceeded the scope of its enforcement power under the fourteenth amendment by applying the law to the states.").

Federal courts have held that RFRA's "acting under color of law" phrase means the same thing as "acting under color of law" in section 1983 and triggers the same analysis.  *See Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997) ("Because the statutory definition of 'government' under RFRA includes any person 'acting under color of law,' the required degree of state action under RFRA is analyzed under the same standard as [section] 1983."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (citing *Brownson* and reaching the same conclusion); *Roman Cath. Diocese of Rockville Ctr.. v. Incorporated Village of Old Westbury*, No. 09-CV-5195-DRH-ETB, 2011 WL 666252, at *10 (E.D.N.Y. Feb. 14,

2011) (same).  Using that federal guidance, the Court will apply the same analysis for "acting under color of law" under RFRA—section 1983's analysis—to the IRFRA claims at issue here.  And with the same analysis comes the same result.  For the same reasons the Court dismissed the plaintiffs' section 1983 claims against DLF and the University, it also dismisses the plaintiffs' IRFRA claims against those same defendants.[6]

### ii.  The Board

The Board presents two arguments for the dismissal of the plaintiffs' IRFRA claim against it.  First, the Board adopts an argument—initially made by DLF—that the plaintiffs are barred from suing under IRFRA in federal court due to sovereign immunity.  The premise of DLF's argument is that the IRFRA requires that one must be the "'government,' which is defined as the State of Illinois, a State official, or one acting under color of state law."  DLF's Br. at 14–15.  Based on this premise, DLF contends that the plaintiffs must be alleging that each defendant is a "government"—but Seventh Circuit case law prohibits federal courts from issuing relief against the state or state officials under the IRFRA.  *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) ("Given the Eleventh Amendment and principles of sovereign immunity, however, a federal court cannot issue relief against a state under [IRFRA].").  The plaintiffs concede this issue.

---

[6] DLF argues that the plaintiffs may not recover monetary damages under IRFRA against persons acting in their individual capacities.  The Court need not consider this argument given the above disposition.  Also, DLF's argument regarding sovereign immunity (which the Board adopts) is moot as it relates to DLF.  Lastly, and for the same reasons, the Court need not consider the University's arguments regarding the relief available to the plaintiffs under IRFRA.

Normally that would be the end of the matter—one party makes an argument and another party concedes.  But in this case both sides are wrong.  As noted earlier, IRFRA does not limit its application to only the State of Illinois, its officials, or those acting under color of state law.  It also includes political subdivisions of the state.  775 ILCS 35/5.  Though IRFRA does not define "political subdivision," Illinois's courts have considered school districts to be political subdivisions of the State.  *See Henrich v. Libertyville High Sch.*, 186 Ill. 2d 381, 405, 712 N.E.2d 298, 310 (1998), *as modified on denial of reh'g* (June 1, 1999) (describing a school district as a political subdivision).

The Eleventh Amendment generally bars suits against *states* and *state officers* in federal court unless the state has consented to suit or Congress has abrogated the state's immunity.  *Nunez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016).  But a "local school district ordinarily is not a 'State' and hence may be sued in federal court for damages or other retroactive relief for violations of federal law or the constitution."  *Gary A. v. New Trier High Sch. Dist. No. 203*, 796 F.2d 940, 945 (7th Cir. 1986) (per curiam); *see also Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 927–29 (7th Cir. 2012).  And though municipal officials may be treated as state officials for Eleventh Amendment purposes, the Board has not offered any facts that would disturb the general assumption that it is not a "state."  *See, e.g., Cassell v. Snyders*, 990 F.3d 539, 552 (7th Cir. 2021) ("[C]ounty and local officials can still be treated as state officials for Eleventh Amendment purposes when carrying out non-discretionary duties subject to state policy control."); *Parker*, 667 F.3d at 927–29 (discussing the factors that determine whether a school district is an arm of the state).  Therefore, the Court concludes that the Board may be sued under IRFRA.

The Board also urges dismissal of the IRFRA claims on the ground that the plaintiffs have failed to state a claim.  IRFRA provides that:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15.  Though the "statute does not define what constitutes a substantial burden," Illinois courts have said that "the hallmark of a substantial burden of one's free exercise of religion is the presentation of a coercive choice of either abandoning one's religious convictions or complying with the governmental regulation."  *Diggs*, 333 Ill. App. 3d at 195, 775 N.E.2d at 45 (citing *Yoder*, 406 U.S. at 217–18); *Students & Parents for Priv. v. Sch. Dirs. of Twp. High Sch. Dist. 211*, 377 F. Supp. 3d 891, 905 (N.D. Ill. 2019).

In the Board's view, neither of the Williamses has stated a claim because neither has alleged they "were presented with a coercive choice of either abandoning their religious convictions or complying with the Quiet Time program."  Bd.'s Br. at 14.  The Court disagrees.  Amontae has alleged that he was presented with a coercive choice. Specifically, he contends that he was coerced to participate in Quiet Time's daily components, that he was assigned a mantra, and that he was pressured to take part in a Puja ceremony.  Amontae also alleges that after he learned of the "hidden religious nature" of Quiet Time, he sought to tell students about his suspicions and was reprimanded and threatened with suspension.  Finally, Amontae claims that while participating in the program, he suffered a possession-like experience that he describes as contrary to his religious upbringing.  Amontae has sufficiently alleged that he was

43

presented with a coercive choice to participate in a program that was contrary to his religious beliefs and suffered harm as a result. His allegations are sufficient to state a claim under IRFRA and more than sufficient to provide notice of his claim to the Board. *See Students & Parents for Priv.*, 377 F. Supp. 3d at 906.

The Board's attempt to contrast this case with *Students & Parents for Privacy* is unavailing. That matter concerned a challenge to a school district policy allowing transgender students to use bathrooms and locker rooms of their choice. *Id.* at 893–94. Like this Court, the court in that case reviewed the plaintiffs' complaint to determine whether they had presented a facially plausible claim. *See id.* at 905. Among the matters the court found coercive was that the district required students to take physical education and swim classes and that persons who objected to the policy were derided as bigots or heckled by other students. *Id.* at 906. That those same facts are not present here does not mean that Amontae's allegations are deficient. The court in *Students & Parents for Privacy* did not hold that coercion may be shown only when there is a districtwide requirement or students are jeered at by other students. *See id*. at 905–06. The concept of coercion is not anywhere near that narrow.

Darryl Williams presents an IRFRA claim as well, but his claim must be dismissed as he does not allege that he was presented with a coercive choice. *See Diggs*, 333 Ill. App. 3d at 195, 775 N.E.2d at 45. Instead, Darryl's allegations are limited to the infringement of his right to dictate his son's religious upbringing. In other words, rather than alleging a coercive choice, Darryl alleges that Amontae was coerced and that this coercion infringed with his (Darryl's) rights. That is insufficient.

**Conclusion**

44

For the reasons stated above, the Court grants the defendants' motions to dismiss [dkt. nos. 42, 45, 47 and 49] in part. The claims of plaintiffs Skinner, SHOS, and CLUB are dismissed for want of standing. The Court concludes that Amontae Williams has standing to sue and that Darryl Williams has standing to sue, though not on the basis of taxpayer standing. Neither Williams has standing to pursue injunctive or declaratory relief; what remains are their claims for damages against certain defendants. The Williamses' section 1983 and IRFRA claims against DLF and the University are dismissed for failure to state a claim. As a result, no claims against DLF or the University remain in the case. Darryl's IRFRA claim against the Board is dismissed for failure to state a claim. What is left are the Williamses' section 1983 claims for damages against the Board and Amontae Williams's IRFRA claim against the Board. The case is set for a telephone status hearing on June 3, 2021 at 9:25 a.m. to set any necessary schedules for further proceedings, using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves. Counsel are directed to confer regarding an appropriate discovery and pretrial schedule and are to file a joint status report on May 28, 2021 with a joint proposed schedule or separate proposals.

MATTHEW F. KENNELLY
United States District Judge

Date: May 21, 2021