**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Amontae Williams, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:20-cv-04540 |
| | ) | |
| v. | ) | |
| | ) | The Honorable Matthew F. Kennelly |
| Board of Education of the City of Chicago, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS BOARD AND DLF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COUNT I

**TABLE OF CONTENTS**

Table of Authorities…………………………………………………………………...TOA 001-005

INTRODUCTION…………………………………………………………………………...1

SUMMARY OF UNDISPUTED MATERIAL FACTS………………………………………1

ARGUMENT…………………………………………………………………………………...3

    I.    AMONTAE FAILS TO ESTABLISH LIABILITY UNDER 42 U.S.C. § 1983……………3

        A.   Amontae Fails to Establish *Monell* Liability Against the Board……………………...4

        B.   Amontae Fails to Establish *Monell* Liability Against DLF………………………...5

        C.   DLF Is Not a State Actor…………………………………………………..……….7

        D.   Amontae Was Not Deprived of His Constitutional Rights…………….……..…..10

             1.   There is no Establishment Clause violation………………………………10

             2.   There is no Free Exercise Clause violation………………………………...17

    II.   AMONTAE CANNOT ESTABLISH DAMAGES………………………………………19

        A.   Amontae's Claims Are Moot Because He Disclaimed Recovery of All Monetary Damages at His Deposition…………………………………………………………19

        B.   In the Alternative, Amontae Cannot Establish That He Is Entitled to Recover Compensatory Damages………………………………………………………...…21

    III.   JURISDICTION OVER AMONTAE'S STATE LAW IRFRA CLAIM…………………..22

CONCLUSION………………………………………………………………………………..23

## TABLE OF AUTHORITIES

**CASES**

*Africa v. Pennsylvania,*
    662 F.2d 1025 (3d Cir. 1981) ……………………………………………………...11

*Alpha Painting & Constr. Co. v. Delaware River Port Auth.,*
    822 Fed. App'x 61 (3d Cir. 2020) …………………………………………………20

*Altman v. Bedford Cent. Sch. Dist.,*
    245 F.3d 49 (2d Cir. 2001) ………………………………………………………...14

*Alvarado v. City of San Jose,*
    94 F.3d 1223 (9th Cir. 1996) ……………………………………………………10

*Am. Legion v. Am. Humanist Ass'n.,*
    139 S.Ct. 2067 (2019) ……………………………………………………13, 17

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ………………………………………………………………7

*Amundsen v. Chicago Park Dist.,*
    218 F.3d 712 (7th Cir. 2000) ……………………………………………………8

*Anderson v. Simon,*
    217 F.3d 472 (7th Cir. 2000) ……………………………………………………4

*Biggs v. Village of Dupo,*
    892 F.2d 1298 (7th Cir. 1990) …………………………………………………..22

*Bd. of Educ. v. Grumet,*
    512 U.S. 687 (1994) ………………………………………………...14 n.3

*Boss v. Castro,*
    816 F.3d 910 (7th Cir. 2016) ……………………………………………………..3

*Cefalu v. Village of Elk Grove,*
    211 F.3d 416 (7th Cir. 2000) ……………………………………………………10

*Cornucopia v. United States Dep't. of Agriculture,*
    560 F.3d 673 (7th Cir. 2009) ……………………………………………………19

*Croft v. Inlight Risk Mgmt., Inc.,*
    No. 01-cv-1766, 2002 WL 31010830 (N.D. Ill. Sept. 9, 2002) …………………………....23

*Cunningham v. Southlake Ctr. for Mental Health, Inc.,*
    924 F.2d 106 (7th Cir. 1991) ……………………………………………………8

*Denius v. Dunlap*,
   330 F.3d 919 (7th Cir. 2003) …………………………………………………………22

*Employment Div. Dept. of Resources of Or. v. Smith*
   494 U.S. 872 (1990) ………………………………………………………………17

*Ervins v. Sun Prairie Area Sch. Dist.*,
   No. 21-cv-366, 2022 U.S. Dist. LEXIS 116575 (W.D. Wis. July 1, 2022) ………………...12

*First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*
   988 F.3d 978 (7th Cir. 2021) ………………………………………………………….4

*Fleischfresser v. Directors of Sch. Dist. 200*
   15 F.3d 680 (7th Cir. 1994 ……………………………………………………………10, 18

*Gardner v. City of Waukegan*
   1999 U.S. Dist. LEXIS 1045 (N.D. Ill. June 4, 1999) ……………………………………8

*Garza v. Henderson*,
   779 F.2d 390 (7th Cir. 1985) …………………………………………………………19

*Gemetzke v. Kenosha Unified Sch. Dist. No. 1*,
   274 F.3d 464 (7th Cir. 2001) …………………………………………………………...7

*Glisson v. Ind. Dep't of Corr*,
   849 F.3d 372 (7th Cir. 2017) …………………………………………………………...5

*Groce v. Eli Lilly & Co.*,
   193 F.3d 496 (7th Cir. 1999) ………………………………………………………….23

*Hilsenrath v. School Dist. of the Chathams*
   Case No. 18-966, 2018 U.S. Dist. LEXIS 100100 (D.N.J. June 13, 2018) ……………….20

*Horina v. City of Granite City, Ill.*,
   538 F.3d 624 (7th Cir. 2008) …………………………………………………………19

*Iskander v. Vill. of Forest Park*
   690 F.2d 126 (7th Cir. 1982) …………………………………………………………...5

*Jackson v. Chicago Housing Auth.*,
   No. 21 C 3313, 2022 U.S. Dist. LEXIS 61453 (N.D. Ill. Apr. 1, 2022) ……………………...7

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) …………………………………………………………..12-13, 16

*Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*,
  183 F.3d 734 (7th Cir. 1999) ……………………………………………………..4

*Lewis v. CITGO Petroleum Corp.*,
  561 F.3d 698 (7th Cir. 2009) ……………………………………………………..3

*Lord v. Beahm*,
  952 F.3d 902 (7th Cir. 2020) …………………………………………………19

*Lynch v. Donnelly*,
  465 U.S. 668 (1984) …………………………………………13, 13 n.2, 17

*McGowan v. Maryland*,
  366 U.S. 420 (1961) …………………………………………………………15

*Medlock v. Trustees of Indiana Univ*,
  683 F.3d 880 (7th Cir. 2012) …………………………………………………19

*Memphis Cmty. Sch. Dist. v. Stachura*,
  477 U.S. 299 (1986) …………………………………………………………19

*Milton v. Wal-Mart Stores, Inc.*,
  No. 11 C 7872, 2012 U.S. Dist. LEXIS 74181 (N.D. Ill. May 25, 2012) …………………..4

*Monell v. Dep't of Social Servs. of City of New York*,
  436 U.S. 658 (1978) …………………………………………………....4-7

*Mullin v. Sussex County*,
  861 F. Supp. 2d 411 (D. Del. 2012) …………………………………………14 n.3

*Pakovich v. Verizon Ltd. Plan*,
  653 F.3d 488 (7th Cir. 2011) …………………………………………………20

*Pinke v. Kuntz*,
  Case No. 18-cv-024, 2020 U.S. Dist. LEXIS 77698 (D.N.D. May 4, 2020) ………………...20

*Rice v. Correctional Medical Services*,
  675 F.3d 650 (7th Cir. 2012) ……………………………………………..5, 7

*Ruffin-Thompkins v. Experian Info. Sys.*,
  422 F.3d 603 (7th Cir. 2005) …………………………………………………21

*Ruiz-Cortez v. City of Chicago*,
  931 F.3d 592 (7th Cir. 2019) …………………………………………………..7

*Satkar Hosp. Inc. v. Cook Cnty. Bd. of Rev*,
  819 F. Supp. 2d 727 (N.D. Ill. 2011) …………………………………………..23

*Scott v. Peterson*,
No. 09-C-1633, 2010 U.S. Dist. LEXIS 81387 (N.D. Ill. Aug. 11, 2010) …………………...22

*Sedlock v. Baird*,
235 Cal. App. 4th 874 (2015) …………………………………………………….14, 14 n.3, 15

*Shahi v. U.S. Dep't of State*,
572 F. Supp. 3d 470 (N.D. Ill. 2021), *aff'd,* 33 F.4th 927 (7th Cir. 2022) ………………20 n.4

*Sherman v. Cmty. Consol. Sch. Dist. 21*,
980 F.2d 437 (7th Cir. 1992) …………………………………………………………………13

*Sherman v. Koch*,
623 F.3d 501 (7th Cir. 2010) …………………………………………………………………13

*Silverman v. Board of Educ*,
No. 08 C 2220, 2010 U.S. Dist. LEXIS 75924 (N.D. Ill. July 26, 2010) ……………………..7

*Spiegel* v. *McClintic*,
916 F.3d 611 (7th Cir. 2019) …………………………………………………………………..8

*Stately v. Indian Cmty. Sch. of Milwaukee*,
351 F. Supp. 2d 858 (E.D. Wis. 2004) …………………………………………………….10-11

*Stevens v. Hous. Auth.*,
663 F.3d 300 (7th Cir. 2011) …………………………………………………………………21

*Stillwell v. Mayflower Contract Servs.*,
No. 94 C 7253, 1995 U.S. Dist. LEXIS 8455 (N.D. Ill. June 19, 1995) ……………………...8

*St. John's United Church of Christ v. City of Chicago*,
502 F.3d 616 (7th Cir. 2007) …………………………………………………………………17

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) ………………………………………………………………………...13, 16

*Uzuegbunam v. Preczewski*,
141 S.Ct. 792 (2021) ………………………………………………………………………..20 n.4

*Van Orden v. Perry*,
545 U.S. 677 (2005) …………………………………………………………………………16-17

*Vision Church, United Methodist v. Vill. of Long Grove*,
468 F.3d 975 (7th Cir. 2006) ……………………………………………………………...17-18

*Williams v. Seniff*,
342 F.3d 774 (7th Cir. 2003) …………………………………………………………………..8

*Wilson v. Warren County*,
   830 F.3d 464 (7th Cir. 2016) ………………………………………………………...7-8

*Wynne v. Town of Great Falls*,
   No. 0:01-3409-22, 2003 U.S. Dist. LEXIS 21009 (D.S.C. Aug. 21, 2003) ………………14 n.3

## **FEDERAL STATUTES**

28 U.S.C. § 1367(c)(3) …………………………………………………………………………..23

42 U.S.C. § 1983 …………………………………………………………………….....*in passim*

## INTRODUCTION

Defendants, the Board of Education of the City of Chicago ("Board") and The David Lynch Foundation ("DLF") are entitled to summary judgment on Count I of Plaintiff, Amontae Williams' ("Amontae") Second Amended Complaint alleging violation of 42 U.S.C. § 1983 for a number of independent reasons. First, Amontae's § 1983 claim fails against both the Board and DLF because he cannot establish municipal or private entity liability under the framework of *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). Second, DLF is not a state actor, and thus, not subject to liability under § 1983. Third, there is no underlying constitutional violation that could serve as a predicate for imposing § 1983 liability on the Board and DLF – namely, there is no violation of the First Amendment. Finally, Amontae cannot establish he sustained any damages. Most fundamentally, Amontae has mooted his case by confirming at his deposition he is not seeking *any* monetary damages in this case – the only remedy left that the Court could provide to him. Further, even if the Court finds Amontae did not disclaim recovery of all monetary relief, his deposition confirms his inability to recover compensatory damages as a matter of law.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

All Defendants have submitted a Joint Rule 56.1 Statement of Facts ("SOF") in support of their motions for summary judgment, which is incorporated herein by reference. As stated therein, this case involves the Quiet Time program ("Quiet Time"), which existed at Bogan High School ("Bogan") – where Amontae attended – until the end of the 2018-2019 school year. SOF ¶¶ 1, 46-47, 71. Quiet Time was one of three winners of a design competition hosted by the University of Chicago ("University") in 2015 and was selected for research on the program's efficacy on reduction of toxic stress and violent behavior of CPS students, as well as on improvement of student attendance and grades. SOF ¶¶ 6-7, 13. The high schools that adopted Quiet Time had two 15-minute periods of quiet activity per school day. SOF ¶ 24. Quiet activity could be virtually

anything like reading a book, drawing, or simply sitting quietly as long as it was not disruptive to other students. SOF ¶¶ 24, 29. A student could even pray quietly to himself/herself if he or she wanted to do so. SOF ¶ 29.

Students participating in Quiet Time were also offered the chance to learn TM. SOF ¶ 28. Learning TM was completely voluntary. SOF ¶ 28. A student did not have to learn or practice TM if that student did not want to do so. SOF ¶¶ 28-29, 45. Students who volunteered to learn TM participated in TM training over four days, which was taught by independent contractors DLF hired. SOF ¶¶ 25-28, 37. Students who did not volunteer to learn TM, or even those who had learned TM but simply chose not to engage in the practice, could engage in some other quiet activity of the student's choosing during each 15-minute quiet period. SOF ¶ 29.

Neither Quiet Time nor its optional TM component are religious. SOF ¶¶ 10-12, 15-16, 33-35. TM is not offered or taught to those who volunteer to learn it as a religious program, there is no religious class or study, and those who volunteer to learn are not taught any ideology or belief system in connection with learning the practice. SOF ¶¶ 32-34, 61. DLF uses teachers certified by an independent organization to teach TM as part of Quiet Time and some of its other programs as a simple, easy-to-learn, evidence-based practice to quiet the mind and reduce toxic stress. SOF ¶¶ 25-27, 34, 53. To practice TM, one basically sits quietly with his eyes closed and repeats silently a "mantra," which is a meaningless sound given to the student to relax and quiet the mind. SOF ¶ 35. Mantras in TM practice are not religious, and they are given to the student during instruction after the certified TM instructor performs a one-time 3-minute expression of gratitude to the tradition of prior teachers who have passed down the technique through generations. SOF ¶¶ 35, 37-43.

Amontae volunteered to learn TM on October 4, 2018 after turning 18 years old during his senior year at Bogan. SOF ¶¶ 57-59. During his TM training between October 15-18, 2018, he reported his experience as "Awesome" and he felt "Great," "relaxed" and "awake." SOF ¶¶ 63-66.

Amontae did not even feel "uncomfortable" after his first day of training, just "skeptical." SOF ¶ 64. After he completed his four days of training, Amontae practiced TM only about 25% of the time. SOF ¶ 67. In the spring of 2019, a substitute teacher at Bogan approached Amontae and told him TM was "unholy," a practice that worshiped Hindu gods, and involved the devil. SOF ¶ 69.

Amontae now contends Quiet Time and its optional TM component violates the Establishment and Free Exercise Clauses of the First Amendment and caused him to wear dark and "gothic" clothing, feel like he was possessed and attracting "demonism," and become violent and depressed. SOF ¶ 79. However, the evidence is undisputed that *before* ever learning TM, Amontae had been "gothic," sold his soul to the devil, suffered from bipolar disorder and suicidal ideation, had an extensive school disciplinary record for extremely violent and lewd behavior, and had been treating with a psychiatrist since he was 7 years old to address these issues. SOF ¶ 79.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Plaintiff must present evidence to establish a triable issue of fact on all essential elements of his case. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

## ARGUMENT

**I.     AMONTAE FAILS TO ESTABLISH LIABILITY UNDER 42 U.S.C. § 1983.**

In order to recover under 42 U.S.C. § 1983, Amontae must first establish municipal liability on his federal claim. To do so, Amontae must show the constitutional deprivation was caused by: (1) the enforcement of an express policy; (2) a widespread practice that is so permanent and well-settled it constitutes a custom or usage with force of law; or (3) a person with final policymaking authority.

*Kujawski* v. *Bd. of Comm'rs of Bartholomew Cnty., Ind.,* 183 F.3d 734, 737 (7th Cir. 1999). The undisputed facts in this case do not establish municipality liability sufficient to survive summary judgment.

After he establishes municipal liability, Amontae must then establish: (1) the defendant intentionally and unlawfully deprived him of a constitutional right and (2) the deprivation occurred under the color of state law. *Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000). The undisputed facts of this case demonstrate that Plaintiff cannot establish either of these elements.

A.    **Amontae Fails To Establish *Monell* Liability Against the Board.**

It is unclear from the operative complaint what theory of municipal liability Amontae alleges against the Board. Amontae has not identified an express policy or final policymaker that caused the alleged constitutional violation in this case, so the Board can only assume that he intends to proceed under the widespread practice theory. However, "liability for improper custom[s] may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Milton v. Wal-Mart Stores, Inc.*, No. 11 C 7872, 2012 U.S. Dist. LEXIS 74181, at *7 (N.D. Ill. May 25, 2012). A municipality is not vicariously liable for the constitutional torts of its employees. *See Monell*, 436 U.S. at 691–94. But a municipality "may be held liable *for its own violations* of the federal Constitution and laws." *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (emphasis added). To prevail, a plaintiff "must challenge conduct that is properly attributable to the municipality itself." *Id.*

Amontae fails to proffer any evidence to create a question of fact concerning the existence of a widespread custom or practice by the Board that caused his alleged injuries. To the extent he alleges "CPS' *practice of facilitating the 'Quiet Time' program*" suffices (ECF No. 89, ¶ 101), there is insufficient evidence to establish this facilitation is widespread or the Board's alleged support of Quiet Time caused him constitutional injuries. Further, to the extent Amontae alleges the Board

"had a practice of making student participation in the Quiet Time program, effectively mandatory for all students and teachers" (*id.* at ¶¶ 106-108), there is no evidence in this record to support that this was a "widespread" practice or the alleged mandatory nature of Quiet Time caused his alleged constitutional injuries.

Moreover, outside certified TM instructors (not Board employees) trained students in TM and led the practice of TM during Quiet Time. (ECF No. 89, ¶¶ 109-113) (referring to Certified TM teachers); *see* SOF ¶¶ 25-27. So, even if Amontae asserts the TM training was a widespread practice that would attach liability to the Board, there is no evidence to support liability against the Board. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (stating "[t]he critical question under *Monell*…is whether a municipal [ ] policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). Accordingly, Amontae's federal claim against the Board fails as a matter of law.

**B.    Amontae Fails To Establish *Monell* Liability Against DLF.**

There is no dispute that DLF is a private entity. SOF ¶ 4. Generally, "a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others civil rights." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Rather, to recover against a private entity, a plaintiff must be able to state a claim under the framework for municipal liability established under *Monell. Rice v. Correctional Medical Services*, 675 F.3d 650, 675 (7th Cir. 2012). Here, Amontae points to no policy, widespread practice, or custom of DLF to teach or promote TM as a religious exercise. ECF No. 89, ¶ 116. For starters, DLF had nothing to do with the creation of TM, but instead, simply uses the technique in some of its programs, including Quiet Time, that are designed to reduce toxic stress. SOF ¶ 25. More importantly, DLF does not teach TM, nor does it train, instruct, or certify those who do teach TM. SOF ¶ 25. TM is trademarked and licensed by an entirely separate,

independent, organization known as the Maharishi Foundation US, Inc. ("MF-US"). SOF ¶ 25. MF-US sublicenses TM to DLF. SOF ¶ 26.

DLF's Sublicensing Agreement with MF-US strictly prohibits DLF from teaching TM, and instead, requires that TM be taught only by certified instructors. SOF ¶ 26. Therefore, even if wanted to, DLF does not and cannot teach TM or instruct others on how to teach TM. SOF ¶ 27. DLF hired certified instructors as independent contractors to teach TM to students in Quiet Time, who had volunteered to learn TM.[1] SOF ¶ 27.

Additionally, DLF's hiring of certified TM instructions is not related to the teaching or promotion of religion, but rather, is designed "to prevent and eradicate the all-pervasive epidemic of trauma and toxic stress among at risk populations" such as "underserved inner city students" and "veterans with PTS and their families and children who are survivors of violence and abuse." (Dkt. 89-5 at 2). Regarding Quiet Time specifically, DLF states TM is "non-religious" and is designed to "reduce stress and dramatically improve academic performance, student wellness, and the school environment" for "millions of children who grow up in an oppressive climate of poverty, violence, and fear." (Dkt. 89-7, pp. 2-3; *see also,* SOF ¶ 11. It was consistent with these goals that DLF offered the TM component of Quiet Time to CPS as an optional, simple, relaxation technique for students designed to reduce toxic stress, reduce teen violence, and improve school culture that was in no way connected with any religion, ideology, or belief system. SOF ¶ 22.

Plaintiff also cannot contend that DLF is subject to liability under *Monell* as one who had final policymaking authority. The Seventh Circuit has made it clear that a final policymaker must be someone who not only authorized the alleged violation, but also has authority that is final in the

---

[1] DLF previously raised a *Monell* argument at the motion to dismiss stage of this case, and the only reason the Court declined to consider the argument at the time was because Amontae had represented to the Court that his theory of liability was not predicated upon DLF's contracting with, and use of, certified meditation instructors. ECF No. 66. at 37. Yet, following the Court's ruling, this has been precisely Amontae's theory against DLF throughout the case. *See* ECF No. 89 at ¶¶ 31, 3-39, 43-44, 61-63; ECF No. 156 at 2, 6; ECF No. 194 at 17, 20; ECF No. 195 at 7-9.

6

special sense that "there is no higher authority." *Gemetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). Here, neither DLF nor the certified TM instructors it hired had any final policymaking authority regarding school programming. *See Silverman v. Board of Educ.*, No. 08 C 2220, 2010 U.S. Dist. LEXIS 75924, at *29-30 (N.D. Ill. July 26, 2010) (holding school superintendents nor principals have final policymaking authority in the Chicago schools).

Moreover, to survive summary judgment under *Monell*, a plaintiff must establish causation – *i.e.,* the defendant through its deliberate conduct was the "moving force" behind the constitutional violation. *Rice*, 675 F.3d at 675. "Causation under *Monell* requires a 'direct causal link' between the municipal action and the constitutional injury." *Ruiz-Cortez*, 931 F.3d 592, 599 (7th Cir. 2019). But-for causation does not suffice under *Monell*. *Id.* Here, there is no evidence of any nexus between any alleged violation of Amontae's constitutional rights and DLF's practice of licensing the TM technique and hiring certified instructors to teach TM as part of Quiet Time, which was designed to reduce students' toxic stress and violence. Accordingly, DLF is entitled to summary judgment.

### C.    DLF Is Not a State Actor.

To prevail in an action brought under § 1983, a plaintiff must establish the defendant's alleged deprivation of his constitutional rights was committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Constitutional claims cannot be based upon private conduct "no matter how discriminatory or wrongful." *Id.* at 50; *Jackson v. Chicago Housing Auth.*, No. 21 C 3313, 2022 U.S. Dist. LEXIS 61453, at *3 (N.D. Ill. Apr. 1, 2022). Here, Amontae contends DLF's conduct is not purely private because it engaged in a conspiracy with the Board, which Amontae contends is a state actor. ECF No. 89 at ¶¶ 2, 116. This argument is without merit.

For a private actor to act under color of state law it must have "had a meeting of the minds and thus reached an understanding" with a state actor to deny the plaintiff a constitutional right. *Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016). Specifically, "[a] requirement of the joint

action charge…is that both public and private actors share a common, unconstitutional goal." *Id.*; *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991). Thus, "[a] private actor…cannot unilaterally convert a state actor's legitimate activity into an illegal act, conferring both constitutional accountability on itself and liability on the state." *Wilson*, 830 F.3d at 464.

Although a conspiracy may be established by circumstantial evidence, the Seventh Circuit has made it clear that such evidence cannot be speculative. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). "A conspiracy claim cannot survive summary judgment if the allegations are vague, conclusory, and include no overt acts reasonably related to the promotion of the alleged conspiracy." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000). Merely aiding or even encouraging state action by a private individual is not the type of "joint activity" that will support the existence of an actual conspiracy. *Spiegel* v. *McClintic,* 916 F.3d 611, 616 (7th Cir. 2019). Rather, Amontae must put forth evidence of a "meeting of the minds" between the private party and the Board to deprive him of his constitutional rights. *Stillwell v. Mayflower Contract Servs.*, No. 94 C 7253, 1995 U.S. Dist. LEXIS 8455, at *14 (N.D. Ill. June 19, 1995); *see also Gardner v. City of Waukegan*, 1999 U.S. Dist. LEXIS 1045, at *9 (N.D. Ill. June 4, 1999) ("It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding.").

There is no evidence of an agreement between DLF and the Board to deprive Amontae of his First Amendment Rights. In fact, the evidence demonstrates the exact opposite: the testimony is unequivocal that there was no agreement between DLF and the Board (or DLF, the Board, and the University for that matter) to put religion into CPS schools. SOF ¶ 16. Not even Amontae could testify to the existence of a "conspiracy." He did not even know he had sued the University or the Board, testifying instead he had brought suit to "shut down the Lynch Foundation." SOF ¶ 17. Even when reminded that he had sued the University, Amontae could not explain why. SOF ¶ 17.

8

Moreover, the events leading to placement of Quiet Time in CPS schools demonstrates a legitimate, lawful, purpose for Quiet Time and inclusion of TM as an optional component of that program; not an agreement to indoctrinate students to the Hindu faith or any other religion. DLF submitted Quiet Time as part of a design competition hosted by the University, which would select finalists that would become part of research study focused upon the program's impact on improving violence or school climate and culture within the City of Chicago, and specifically, Chicago Public Schools. SOF ¶¶ 7-10. Neither the competition nor any of the over 200 proposals submitted, including DLF's, had anything to do with religion or the study of religious principles. SOF ¶ 12.

Instead, DLF's design competition proposal entitled "Silence the Violence Through the Transcendental Meditation Program," described a proposed study of the use of TM to reduce toxic stress in students and alleviate its risk factors associated with higher levels of violence including anger, impulsivity, low grades, suspensions and dropping out from school. SOF ¶¶ 8-9. On March 1, 2018, DLF entered into a Services Agreement with the Board, which stated the agreed upon goal of Quiet Time was to "positively affect the stress response enough to meaningfully impact students, leading to reduced negative behaviors and improved academic performance." SOF ¶ 21.

Additionally, teachers at CPS and researchers from the University who received training in the practice of TM did not find it to be religious. SOF ¶ 15. All Defendants understood TM was being offered to students as a simple, non-religious, easy-to-learn, relaxation technique designed to reduce toxic stress and student violence, the effectiveness of which would be the subject of a research study that the University conducted. SOF ¶ 34. Even Amontae admitted that when he elected to learn TM, he was told TM is not religious and a relaxation technique he could use to help reduce stress. SOF ¶ 61. Amontae also conceded that when learning TM, he was never told to believe in any religion or ideology. SOF ¶ 61. Since Amontae cannot offer any evidence that DLF and the Board had an agreement or "meeting of the minds" to unconstitutionally place religious

programming into CPS schools, DLF is not a state actor and is entitled to summary judgment in its favor on Amontae's § 1983 claim.

### D. Amontae Was Not Deprived of His Constitutional Rights.

Even if Amontae could establish municipal liability, Defendants are still entitled to summary judgment because there is insufficient evidence Amontae was deprived of any constitutional right. *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("There is no constitutional violation in conspiring to cover up action which does not itself violate the constitution."). Here, Amontae's claim that Quiet Time violated his constitutional rights under the Establishment and Free Exercise Clauses of the First Amendment fails due to insufficient evidence.

#### 1. There is no Establishment Clause violation.

The Establishment Clause of the First Amendment provides "Congress shall make no law respecting an establishment of religion." *U.S. Const. Amend. I*. Although alleged violations of the Establishment Clause in schools "present heightened concerns for courts," that concern is "balanced to a great degree by the broad discretion of a school board to select its public-school curriculum." *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 686 (7th Cir. 1994). Thus, a court will "inject itself in a controversy regarding the daily operation of a school system" only if the challenged activity "clearly violated the First Amendment." *Id*.

Prior to an Establishment Clause analysis, there is the difficult threshold question of whether Quiet Time even constitutes a religion. *See Fleischfresser*, 15 F.3d at 687; *see also Alvarado v. City of San Jose*, 94 F.3d 1223, 1227 (9th Cir. 1996) ("Attempting to define religion, in general and for the purposes of the Establishment Clause, is a notoriously difficult, if not impossible, task."). However, a number of courts have determined that usually a religion will: (i) address deep, fundamental questions, (ii) is also usually comprehensive in nature, involving a belief system rather than isolated teachings, and (iii) often marked by formal and external signs or ceremonies. *Id*.; *see also Stately v.

*Indian Cmty. Sch. of Milwaukee*, 351 F. Supp. 2d 858, 867 (E.D. Wis. 2004) (citing *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)).

Here, the record does not support that Quiet Time was religious. SOF ¶¶ 10-12, 15-16, 22, 32-35, 53, 61. First, learning or practicing TM did not address any "deep, fundamental, questions." *See Stately*, 51 F. Supp. 2d at 867. Indeed, neither Quiet Time nor TM is offered or taught as a religious program, and those who volunteer to learn TM (including the CPS students) are expressly told it is not religious. SOF ¶¶ 32-35, 61. Further, CPS students who learned TM were not taught any ideology or belief system in connection with learning the practice. SOF ¶¶ 34, 61. Students were simply taught a relaxation technique designed to reduce toxic stress that is simple and easy to use. SOF ¶¶ 21-22, 34, 53. Once a student elected to learn TM, he/she/they learned the TM meditation technique in four (4) one-hour training sessions taught by a certified TM instructor. SOF ¶¶ 25-28, 37. Upon completion of the course, the student was free to use, or not use, the technique as a quiet activity during the two 15-minute Quiet Time sessions during the school day. SOF ¶¶ 24, 29, 45.

Additionally, neither Quiet Time nor its optional TM component is "comprehensive in nature or involves any sort of a belief system." *See Stately*, 351 F. Supp. 2d at 867; SOF ¶¶ 32-35, 61. TM practice involves sitting quietly with the eyes closed. SOF ¶ 35. The person then repeats silently (not aloud or even by moving one's lips) a "mantra," which is a meaningless sound provided to a person during the instruction on how to properly perform the practice. SOF ¶ 35. Mantras are sounds, not words; they are not written down or spelled when the instructor gives them to a student. SOF ¶ 35. A person practicing TM repeats the mantra to relax and quiet his/her/their mind. SOF ¶¶ 35. Instructors ask persons who learn TM not to share their mantra or utter the sound verbally because to do so is believed to adversely impact its ability to be used as a private relaxation tool. SOF ¶ 36. Mantras in TM practice are not religious, and they are given no religious significance when taught to students. SOF ¶ 35.

Prior to the first TM training session, the certified TM instructor explained to the students that as part of the teaching tradition of TM, that he or she would perform a brief, one-time, expression of gratitude or thanks to prior teachers of the practice for passing the practice down. SOF ¶¶ 37-38, 41. The expression of gratitude lasted approximately three minutes and involved the teacher reciting or singing a verse in Sanskrit before a picture of an ancient TM teacher named Guru Dev, who represents prior teachers who passed down the practice. SOF ¶ 38. The student did not have to participate, and the Sanskrit words were not translated for the student. SOF ¶¶ 39, 42, 62.

During the brief expression of gratitude, the certified TM instructor would place items such as flowers, fruit, or candles around the picture, but the student would simply observe. SOF ¶¶ 39-40. The instructor wore no special clothing or symbols, just regular casual attire. SOF ¶ 41. This one-time, three-minute recital that was not linked to any religion or belief system for the student simply does not raise Quiet Time to the level of being religious – even if TM can ultimately be traced back to some ancient Indian Vedic culture. *See, e.g.*, *Ervins v. Sun Prairie Area Sch. Dist.*, No. 21-cv-366, 2022 U.S. Dist. LEXIS 116575, at *27-28 (W.D. Wis. July 1, 2022) (interactive student assignment to apply principles of ancient legal code on how to punish a hypothetical slave was not religious because the code originated from ancient theologically based Mesopotamian culture).

Regardless, even assuming Quiet Time, or some slim portion of it, qualifies as "religious," the manner in which the program was implemented in CPS schools did not violate the Establishment Clause. An Establishment Clause violation does not automatically follow whenever a public school fails to censor private religious speech, as the Establishment Clause does not compel the government to "purge from the public sphere" anything an objective observer could reasonably infer endorses or "partakes of the religious." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022). Rather, the Establishment Clause must be interpreted by "reference to historical practices

12

and understandings." *Id.* at 2428. An Establishment Clause analysis is focused on original meaning and history, in accordance with the understanding of the founding fathers. *Id.*

Looking to historical practices and understandings, the Supreme Court has long held the Establishment Clause does not erect a strict bar to the retention of religious symbols or practices in government programs. *See Am. Legion v. Am. Humanist Ass'n..*, 139 S.Ct. 2067, 2081 (2019). Indeed, cases consistently recognize that complete separation between church and state is impossible, noting "[t]here is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).[2] Indeed, the presence of prayer or religious symbolism in government practice is not violative of the Establishment Clause if historical practice dictates the setting in which the prayer is offered and the audience to whom it is directed would appear to the reasonable observer to be acquainted with heritage and tradition as opposed to "afford[ing] government an opportunity to proselytize or force truant constituents into pews." *Town of Greece v. Galloway*, 572 U.S. 565, 587 (2014).

In the school context, *Kennedy* emphasized "[t]his Court has long recognized…secondary school students are mature enough to understand that a school does not endorse, let alone coerce them to participate in speech it merely permits on a nondiscriminatory basis." *Kennedy*, 142 S. Ct. at 2430; *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 439 (7th Cir. 1992) (holding recitation of the Pledge of Allegiance prior to the school day was constitutional so long as pupils were free to choose to decline to participate). Periods of silence and quiet activity during the school day adopted by public school systems have also been upheld as constitutional even if they provide an opportunity for prayer or silent reflection. *Sherman v. Koch*, 623 F.3d 501, 508 (7th Cir. 2010) (holding no violation of Establishment Clause in statute providing a moment of silence at the beginning of the school day

---

[2] The *Lynch* Court provided a number of examples where our country's history has been "pervaded by religious beliefs," including the motto "In God We Trust," that appears on our national currency, the inclusion of "One nation under God" in our Pledge of Allegiance, and Congress' direction to proclaim a National Day of Prayer each year. *Lynch*, 465 U.S. at 676-77.

because it had a secular purpose that "intended to calm students and ready them for the school day"). Additionally, cases have upheld public schools teaching mind and body exercises tied to ancient cultures and practices, even religious ones, especially when they are presented and taught to the students in a way that is non-religious and designed to promote mental and physical health. *Sedlock v. Baird*, 235 Cal. App. 4th 874, 892-99 (2015).[3]

In *Sedlock*, the court upheld the constitutionality of an Ashtanga yoga course taught to public school students even though the yoga poses could be traced to have originated from Hindu texts and could have religious significance in the Hindu faith. *Sedlock*, 235 Cal. App. 4th at 878-83. The court found this yoga course was constitutional even though the students had been taught some Sanskrit words and a decorative tree made of tissue paper containing Sanskrit words relating to claimed religious origins of the practice appeared for a time in the classroom. *Id.* The court noted the course did not violate the Establishment Clause because it was implemented and taught with a secular purpose to improve students' physical and mental health without any mention of, much less instruction in, religious concepts, including Hindu origins or history relating to the practice. *Id.* at 892-94 *citing, Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 65 (2d Cir. 2001) (school yoga instruction led by Sikh minister in religious dress did not violate the Establishment Clause because class did not advance any religious concepts or ideas).

Similarly, Quiet Time did not violate the Establishment Clause. First, there was no coercion for students to participate in the TM component of Quiet Time. SOF ¶¶ 22, 28-29, 30, 39, 45, 55. Students could volunteer to learn TM, but did not have to learn or participate in the practice if they

---

[3] *Sherman* and *Sedlock* utilized the *Lemon* test. However, that does not make them irrelevant to the analysis. Courts have noted the *Lemon* test is actually "more restrictive" than the "historical practices and understandings" inquiry. *See Mullin v. Sussex County*, 861 F. Supp. 2d 411, 421 n.7 (D. Del. 2012); *Wynne v. Town of Great Falls*, No. 0:01-3409-22, 2003 U.S. Dist. LEXIS 21009, at *15 (D.S.C. Aug. 21, 2003) (historical practice test is "less stringent" than the *Lemon* test); *see also Bd. of Educ. v. Grumet*, 512 U.S. 687, 721 (1994) (O'Connor, J. concurring) (noting *Lemon* is broader than other Establishment Clause tests but stating "abandoning the *Lemon* framework need not mean abandoning some of the insights that the test reflected, nor the insight of the cases that applied it.").

did not want to. SOF ¶¶ 28-29, 45, 58. Even after learning the practice, a student did not have to practice TM during the two 15-minute Quiet Time sessions per day – students could do another quiet activity as long as it was not disruptive to other students. SOF ¶¶ 24, 29, 45. Indeed, Amontae admitted that after volunteering and learning TM, he only practiced it during Quiet Time about 25% of the time, and eventually stopped altogether. SOF ¶¶ 58, 67. In fact, there was no way to tell whether someone was meditating or not during those sessions. SOF ¶ 31.

Second, historical practices and understandings confirm TM as taught in the CPS schools and practiced in modern day society, is a secular practice. Indeed, as noted in *Sedlock*, "[c]ultural history establishes not a few practices and prohibitions religious in origin which are retained as secular institutions and ways long after their religious sanctions and justifications are gone." *Sedlock*, 238 Cal.App.4th at 893 *citing, McGowan v. Maryland*, 366 U.S. 420, 503-04 (1961) (Frankfurter, J. concurring). The *Sedlock* court provided a number of examples (*e.g.,* chiropractic care, acupuncture, karate, and taekwondo) that a reasonable observer would not conclude to violate the Establishment Clause merely because of some historical association with religion. *Sedlock*, 238 Cal. App.4th at 893.

Third, and as previously discussed, TM was taught to students without any course, instruction, or even mention of any ideology or belief system. SOF ¶ 34. TM was explained to the students as a relaxation technique that was being taught to them to help them reduce toxic stress and improve academic performance. SOF ¶¶ 22, 34, 53, 60. All who learned TM were told that TM is a non-religious exercise*,* and that is precisely how the practice was taught by the certified TM instructors. SOF ¶¶ 11, 21-22, 34-35, 53, 61.

Amontae's Establishment Clause claim focuses heavily on the one-time, three-minute expression of gratitude performed on his first day of TM training. However, Amontae merely "stood and watched" and was not coerced or required to participate in this "ceremony." SOF ¶¶ 39, 62. Recent Establishment Clause precedent clearly states that merely seeing or hearing another

participate in a religious exercise is insufficient to constitute an Establishment Clause violation. *See Kennedy,* 142 S. Ct. at 2430. Amontae's belated offense at witnessing the ceremony and Quiet Time does not constitute coercion. *Town of Greece*, 572 U.S. at 567 ("[O]ffense does not equate to coercion.") (cited with approval in *Kennedy*, 142 S. Ct. at 2430). "[L]earning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to "a tolerant citizenry." *Kennedy*, 142 S. Ct. at 2430.

Additionally, even assuming the three-minute ceremony constituted prayer, when viewed within the nation's historical context, it still does not offend the Establishment Clause. "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Van Orden v. Perry*, 545 U.S. 677, 686 (2005). Again, prayer, especially at the opening of a program, has a long history of lending gravity to the occasion and has become part of the United States' heritage and tradition. *Town of Greece,* 572 U.S. at 583. A solemn, respectful invocation like the ceremony of gratitude that invites program participants to reflect upon shared ideals and common goals is permissible. *Id.* The "ceremony," which was in Sanskrit (a language unintelligible to Amontae), did not denigrate nonbelievers, threaten damnation or preach conversion. *Id.* Our nation's tradition assumes that adult citizens, like Amontae, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith. *Id.* (citing a letter from John Adams to Abigail Adams (Sept. 16, 1774)). As previously discussed, the state of Illinois has a particular history of promoting silent reflection and prayer, having maintained a state law to that effect since 1969, and the Seventh Circuit has upheld its constitutionality. *Sherman ex rel. Sherman,* 623 F.3d at 518.

Moreover, even if the practice of TM (or inexplicably even Quiet Time) originated from a Hindu religious tradition, this is likewise insufficient to constitute a violation of the Establishment Clause. "Simply having religious content or promoting a message consistent with a religious doctrine

does not run afoul of the Establishment Clause." *Van Orden v. Perry*, 545 U.S. 677, 690 (2005). Even assuming *arguendo* TM stemmed from a religious text or was otherwise founded in a religious tradition like Hinduism, its current meaning is nonreligious and for the secular purpose of reducing toxic stress. As such, it cannot constitute a violation of the Establishment Clause. *See Am. Legion,* 139 S. Ct. at 2089 (holding a cross, in context, took on a secular meaning and as such, did not violate the Establishment Clause); *Lynch*, 465 U.S. at 683 (city's inclusion of a creche as part of a holiday display in a secular manner did not violate the Establishment Clause simply because its "reason or effect merely happens to coincide or harmonize with the tenets of some . . . religions.") Given the rich history of prayer and tolerance for secular practices or symbols notwithstanding their religious origins, neither TM nor Quiet Time constitute a violation of the Establishment Clause. As such, Amontae's only federal claim cannot survive summary judgment.

### 2. There is no Free Exercise Clause violation.

The First Amendment's Free Exercise Clause provides that no law will prohibit the free expression of religion. *U.S. Const. amend. I.* The free exercise analysis begins with an inquiry into whether the law at issue is neutral and generally applicable. *Vision Church, United Methodist v. Vill. of Long Grove,* 468 F.3d 975, 996 (7th Cir. 2006). Thus, the Free Exercise Clause is not absolute: laws that incidentally burden particular religious practices do not violate the Free Exercise Clause as long as they are neutral and generally applicable. *Employment Div. Dept. of Resources of Or. v. Smith*, 494 U.S. 872, 879 (1990). These neutral rules of general applicability need not be evaluated under the stricter "compelling governmental interest" standard and do not mandate an accommodation for those individuals that the law burdens. *Id.* at 884.

A law is not neutral if "the object of the law is to infringe upon or restrict practices because of their religious motivation." *St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 631 (7th Cir. 2007). The related principle of "general applicability" forbids the government from "impos[ing]

burdens only on conduct motivated by religious belief in a selective manner." *Id.* Here, use of Quiet Time as part of the curriculum in CPS schools was both neutral and generally applicable. Quiet Time and its optional TM component was introduced to help students deal with toxic stress, reduce student violence, and improve academic performance and school culture, not to teach, practice, or even discuss religion. SOF ¶¶ 11, 21-22, 28-29, 34, 53.

Further, TM is non-religious and was presented as such to the students. SOF ¶¶ 10-12, 15-16, 22, 32-35, 53, 61. Again, no religious programming or belief system was taught with TM – it was taught as a secular relaxation technique, which was optional for the students to learn. SOF ¶¶ 28-29, 32-35, 58, 61. As a result, the practice of TM as a part of Quiet Time could not possibly have discriminated against any students' beliefs or non-beliefs. Also, Quiet Time and the TM option was presented to all students in the same general manner. SOF ¶¶ 24-45. Students did not have to learn or practice TM, and for all students (whether they practiced TM or not), the same basic rules of the classroom applied to simply engage in a quiet activity that did not disrupt others. SOF ¶¶ 22, 24, 28-29, 31, 52, 58. During Quiet Time, a student could either practice TM (if he had elected to learn it), not practice it all, or engage in some other quiet activity – even read a book, draw a picture, or engage in silent prayer of the student's chosen religion. *Id.*

Whether Amontae can show that Defendants substantially burdened his religious exercise may also be a consideration for the Court. *See Vision Church United Methodist*, 468 F.3d at 996. The Supreme Court has found a "substantial burden" to exist when the government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 997. Stated another way, a substantial burden means a coercive effect. *Fleischfresser*, 15 F.3d at 689-90. The record shows the TM component within Quiet Time was optional. Students did not even have to learn TM if they did not want to, and students who did volunteer and learned TM did not have to practice it, ever, if they did not want to do so. SOF ¶¶ 22, 24, 28-29, 31, 52, 58. Indeed, Amontae, even after he was

taught TM, frequently chose not to practice TM, using it only 25% of the time. SOF ¶ 67. For all of these reasons, Quiet Time did not violate any student's right to free expression of religion.

## II.  AMONTAE CANNOT ESTABLISH DAMAGES.

It is well-established that "[a] section 1983 action is a tort damage action even though the duty the defendant is alleged to have breached is created by the Constitution or federal law." *Garza v. Henderson*, 779 F.2d 390, 395 (7th Cir. 1985). Therefore, even if Amontae is able to establish liability, he must also demonstrate the state actor's violation of his constitutional rights caused him actual injury or damages. *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). As in a common law tort action, he bears the burden of establishing damages. *See Garza*, 779 F.2d at 395.

Further, although a district court may award compensatory damages to a successful § 1983 plaintiff, it may not award damages to account for "the abstract value of a constitutional right." *Horina v. City of Granite City, Ill.,* 538 F.3d 624, 637-38 (7th Cir. 2008). Accordingly, a district court may award the plaintiff damages only if he can prove that the denial of his constitutional rights resulted in an actual injury. *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 308 (1986).

### A.  Amontae's Claims Are Moot Because He Disclaimed Recovery of All Monetary Damages at His Deposition.

Article III of the Constitution limits federal courts' scope of judicial review to live cases and controversies. *Medlock v. Trustees of Indiana Univ.*, 683 F.3d 880, 882 (7th Cir. 2012). It is well-established the federal courts have no authority to rule where the case or controversy has been rendered moot. *Cornucopia v. United States Dep't. of Agriculture*, 560 F.3d 673, 676 (7th Cir. 2009). Thus, if an event occurs while a case is pending that makes it impossible for the court to grant any effectual relief whatsoever to a prevailing party, the case must be dismissed. *Id.*; *Medlock*, 683 F.3d at 882 (noting a court "must, on its own, dismiss a case as moot when it cannot give the petitioner any effective relief.").

That is precisely the case here. After denying Plaintiffs' motion for preliminary injunction (Dkt. 23), the Court dismissed all of their claims for equitable relief; not once, but twice (Dkt. 65, 81). Thus, Amontae's sole remaining claim in this case is one for alleged compensatory damages for emotional distress, or in the alternative, nominal damages. However, at his deposition, Amontae confirmed he "is not hoping for money in this lawsuit." SOF ¶ 77. By disclaiming monetary relief, Amontae has waived his right to not only compensatory damages, but also, nominal damages. *See Alpha Painting & Constr. Co. v. Delaware River Port Auth.*, 822 Fed. App'x 61, 68-69 (3d Cir. 2020) (by stating it did not seek monetary damages, plaintiff waived its right to recover nominal and compensatory damages, making its claims moot); *Pinke v. Kuntz*, Case No. 18-cv-024, 2020 U.S. Dist. LEXIS 77698, at *8 (D.N.D. May 4, 2020) (plaintiff's discovery responses that she was not claiming any monetary damages abandoned all forms of relief requested in the complaint and mooted her claims, including nominal damages); *Hilsenrath v. School Dist. of the Chathams*, Case No. 18-966, 2018 U.S. Dist. LEXIS 100100, at *9 (D.N.J. June 13, 2018) (statement that plaintiff did not seek money damages construed as a disclaimer of nominal damages).[4]

Because nominal and compensatory damages were the only relief the Court permitted Amontae to pursue following Defendants' motion to dismiss, his disclaimer of such monetary damages has left this Court with no means to impose a remedy in this case. The fact that Amontae makes a claim for attorneys' fees under 42 U.S.C. § 1983 and the IRFRA does not change this analysis. A claim for attorneys' fees cannot save a case from becoming moot. *See Pakovich v. Verizon Ltd. Plan*, 653 F.3d 488, 492 (7th Cir. 2011). For this reason alone, Defendants are entitled to entry of summary judgment in their favor.

---

[4] The above cases are consistent with the Supreme Court's recent pronouncement that nominal damages are a form of monetary relief. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 800-01 (2021); *see also Shahi v. U.S. Dep't of State*, 572 F. Supp. 3d 470, 481 (N.D. Ill. 2021), *aff'd*, 33 F.4th 927 (7th Cir. 2022) (holding "[n]ominal damages are money damages.")

**B.     In the Alternative, Amontae Cannot Establish That He Is Entitled To Recover Compensatory Damages.**

Even if the Court were to find that Amontae has not disclaimed all forms of monetary damages (including nominal damages) and thus mooted his case, he still is unable to demonstrate that he is entitled to recover any compensatory damages. In his Complaint, Amontae asserts in conclusory fashion that he is entitled to compensatory damages in the form of "emotional distress." (Dkt. 89, ¶¶ 117, 125). However, the Seventh Circuit has maintained a strict standard for a finding of emotional distress damages because they are so easy to manufacture. *Ruffin-Thompkins v. Experian Info. Sys.*, 422 F.3d 603, 609 (7th Cir. 2005). Here, Amontae can only present his own testimony in support of his claim for emotional harm, and when that is the case, he must explain his injury in reasonable detail rather than relying upon mere conclusory statements." *Stevens v. Hous. Auth.*, 663 F.3d 300, 308 (7th Cir. 2011).

The Seventh Circuit requires a plaintiff "to show 'demonstrable emotional distress' not just point to circumstances of the constitutional violation which might support an inference of emotional injury." *Stevens*, 663 F.3d at 308. Here, Amontae does not claim to have seen any health care professional as a result of any claimed emotional distress he claims to have sustained as a result of practicing TM for a brief period of time. SOF ¶ 77. In fact, it is undisputed that Amontae had been in therapy and treatment for bipolar disorder and other severe mental health issues for years before he ever learned the practice of TM. SOF ¶ 79.

When asked about the harm he suffered from his participation in Quiet Time, Amontae's answers were vague, conclusory, and inconsistent. Amontae was only able to testify: "The only harm I can say I endured because of the program was how it affected me internally and the disciplinary action I was under for not participating." SOF ¶ 78. He also said he felt "different" like "hypnosis" after participating in TM but could give no further details. *Id.* Indeed, Amontae described learning TM as "awesome," that it made him feel "great," and it "did not cause him to become

uncomfortable," only "skeptical." SOF ¶¶ 63-64. While Amontae stated during his deposition that TM caused him to become more "dark," begin to start fires, be irritable, and feel like he was "possessed" and attracting "demonism," he admitted almost immediately thereafter that well *before* learning TM, he had been wearing dark and gothic clothing, had sold his soul to the devil, had punched himself and holes in walls, had suicidal ideation, had an extensive school disciplinary record for violent and lewd behavior, and acted out violently in other ways such as killing a kitten and puppy. SOF ¶ 79.

In short, Amontae's vague and inconsistent testimony regarding any emotional harm TM allegedly caused him is insufficient to establish the requisite causal relationship between his emotional distress and alleged constitutional violation. *See Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) ("bare allegations by a plaintiff that the defendant's conduct made him 'depressed,' 'humiliated,' or the like are not sufficient to establish injury [for pain and suffering in an § 1983 action] unless the facts underlying the case are so inherently degrading…to infer that a person would suffer emotional distress…"); *Biggs v. Village of Dupo*, 892 F.2d 1298, 1305 (7th Cir. 1990) (plaintiff's testimony she was depressed, a little despondent, or even completely humiliated were insufficient); *Scott v. Peterson*, No. 09-C-1633, 2010 U.S. Dist. LEXIS 81387, at *17 (N.D. Ill. Aug. 11, 2010) (plaintiff's vague statements about humiliation, loss of relationships, and sleeplessness, without more, were insufficient to prevent summary judgment on compensatory damages). Accordingly, even if the Court finds Amontae's disclaimer of monetary damages does not moot his case, Defendants are still entitled to summary judgment on his claim for compensatory damages.

## III. JURISDICTION OVER AMONTAE'S STATE LAW IRFRA CLAIM.

Defendants filed a separate brief related to Amontae's state law claim, Count II of Plaintiff's Second Amended Complaint relating to Illinois Religious Freedom Restoration Act, 775 ILCS 35/1, *et seq.* ("IRFRA"). As such, Defendants ask this Court to issue a substantive ruling on their motion

for summary judgment as to that claim. *See, e.g., Croft v. Inlight Risk Mgmt., Inc.,* No. 01-cv-1766, 2002 U.S. Dist. LEXIS 16998, at *12 (N.D. Ill. Sept. 9, 2002) (Kennelly, J.) (retaining supplemental jurisdiction for summary judgment); *accord Satkar Hosp. Inc. v. Cook Cnty. Bd. of Rev.,* 819 F. Supp. 2d 727, 739 (N.D. Ill. 2011) (Kennelly, J.), *aff'd,* 733 F.3d 705 (7th Cir. 2013). If this Court dismisses the federal § 1983 claim, Defendants acknowledge this Court would have discretion to decline to exercise supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(c)(3); *see Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999).

## CONCLUSION

For the reasons stated above and in the corresponding Motion for Summary Judgment on Count II, Defendants Board of Education of the City of Chicago and The David Lynch Foundation ask this Court to grant summary judgment in their favor, dismiss Plaintiff's remaining claims in their entirety and with prejudice, enter judgment in their favor, award the costs of litigating this lawsuit, and grant any other relief the Court deems just.

Date: November 22, 2022                              Respectfully submitted,

**Defendant Board of Education of the City of Chicago**
**Joseph Moriarty**, General Counsel                 **The David Lynch Foundation**

/s/ Elizabeth K. Barton                              /s/ James J. Sipchen
Elizabeth K. Barton, Atty No. 6295848                James J. Sipchen, Atty No. 6226113

Elizabeth K. Barton / ekbarton@cps.edu
Kaitlin T. Salisbury / ktsalisbury@cps.edu
Christina L. Rosenberg / crosenberg@cps.edu         James J. Sipchen
The Board of Education of the City of Chicago       jsipchen@pretzel-stouffer.com
Law Department                                       Pretzel & Stouffer, Chartered
1 N. Dearborn St, #900                               One S. Wacker Drive- Suite 2500
Chicago, IL 60602                                    Chicago, IL 60606-4673

## <u>CERTIFICATE OF SERVICE</u>

      I, Elizabeth K. Barton, hereby certify that I served the attached **Defendants' Memorandum of Law In Support of Their Motion For Summary Judgment (Count I)** on counsel of record via the Court's CM-ECF E-Filing on November 22, 2022.

By:     <u>/s/ Elizabeth K. Barton</u>
            Elizabeth K. Barton, Atty No. 6295848

24