**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **AMONTAE WILLIAMS,** ) | |
| ) | **Case No. 20 C 4540** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **BOARD OF EDUCATION OF** ) | |
| **THE CITY OF CHICAGO;** ) | |
| **THE DAVID LYNCH FOUNDATION;** ) | |
| **and the UNIVERSITY OF CHICAGO,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Amontae Williams has sued the Board of Education of the City of Chicago (the

Board), the David Lynch Foundation (DLF), and the University of Chicago (the

University) for violations of the Establishment Clause and Free Exercise Clause of the

federal constitution and the Illinois Religious Freedom Restoration Act (IRFRA).  In

earlier decisions, this Court granted the defendants' motion to dismiss Williams's

amended claim in part and his motion for leave to amend his complaint.  *See*

*Separation of Hinduism From Our Schs. v. Chicago Pub. Schs., City of Chicago Sch.*

*Dist. #299*, No. 20 C 4540, 2021 WL 2036536 (N.D. Ill. May 21, 2021); *Separation of*

*Hinduism From Our Schools v. Chicago Pub. Schs.*, No. 20 C 4540, 2021 WL 3633939

(N.D. Ill. Aug. 17, 2021).  The Court also denied Williams's motion for class certification,

dismissed his father Darryl Williams's claim for lack of standing, and denied Williams's

motion for reconsideration of that decision.  *See Williams v. Bd. of Educ. of the City of*

*Chicago*, No. 20 C 4540, 2022 WL 4182434 (N.D. Ill. Sept. 13, 2022); *Williams v. Bd. of Educ. of the City of Chicago*, No. 20 C 4540, 2022 WL 17082571 (N.D. Ill. Nov. 18, 2022). The claims that remain are Williams's claim under 42 U.S.C. § 1983 against the Board and DLF and his IRFRA claim against all three defendants. The defendants now move for summary judgment and Williams cross-moves for partial summary judgment. For the reasons stated below, the Court grants summary judgment for the defendants on Williams's IRFRA claim but otherwise denies both sides' motions.

**Background**

The Court recounts the following facts from the parties' Local Rule 56.1 statements, exhibits, and summary judgment briefing. The facts as set out below are undisputed except where otherwise noted.[1]

Williams attended Bogan Computer Technical High School (Bogan) in Chicago from fall 2017 until he graduated on June 18, 2019. While Williams was a student, Bogan implemented the Quiet Time program during the 2017–18 and 2018–19 school years.

Each defendant played a role in implementing the Quiet Time program in Bogan and seven other Chicago schools. The Board approved the program and entered into a services contract with DLF, which stated that DLF was to operate Quiet Time in schools

---

[1] The parties dispute whether the Court should strike various unsupported statements in Williams's Local Rule 56.1 Statement and treat as admitted parts of the defendants' Local Rule 56.1 Statement that Williams failed to properly contest. The defendants also argue that the Court should strike parts of Williams's declarations, the affidavit of Bogan High School student Mariyah Green, and the testimony of Williams's purported expert Aryeh Siegel. Because there remain genuine and material factual disputes even if the Court were to do everything the defendants ask, the Court need not decide these points.

and hire certified instructors to teach Transcendental Meditation to interested students. The Board also permitted the University to conduct a study researching and evaluating the effects of Quiet Time. The agreements between the Board, DLF, and the University did not indicate that Quiet Time was religious or mention any other religious programming.

The Board permitted each individual school's principal to decide whether to implement Quiet Time. Bogan Principal Alahrie Aziz-Sims agreed to introduce Quiet Time at Bogan after meeting with DLF representatives and learning Transcendental Meditation herself. As part of the Quiet Time program, Bogan implemented two fifteen-minute periods of quiet activity during each school day. Williams testified during his deposition that during the 2017–18 school year he saw other students "choos[ing] to sneak and be on their phone or go to sleep or whatever, but no one was meditating." Defs.' Joint LR 56.1 Stat., Ex. 1, at 69:12–15 (dkt. no. 216-2) (Williams Dep.).

According to Williams, his first experience with Transcendental Meditation as a part of the Quiet Time program occurred during the 2018–19 school year, when he was eighteen years old. He stated that he did not receive any letters about the program to give to his parents, but in October 2018 he and other students were given a document titled "Quiet Time Program Student Application for Transcendental Meditation Instruction Bogan High School." *Id.* at 85:23–86:2, 91:1–10. He also stated that he had been informed that Transcendental Meditation was "a really effective way to meditate and find yourself" and that he signed the form when it was first presented to him because he "was interested learning [meditation] properly." *Id.* at 96:21–22, 97:10–11. Although the document included language stating that "learning the TM technique is an

optional activity," Williams maintained it was "not optional" and "mandated" for students to sign the document. *Id.* at 100:17–18, 15. He explained that this was because students who initially chose not to learn Transcendental Meditation "eventually had to sign up," though "off the top of [his] head at the [moment]" he was unable to name any student who did not sign the document at first and later "was forced to do [Transcendental Meditation]." *Id.* at 101:3, 102:11–18. As for meditating during the fifteen-minute Quiet Time periods, Williams did not dispute that "if [he] didn't want to do [Transcendental Meditation], [he] didn't have to." *Id.* at 122:16–21.

In contrast, Principal Aziz-Sims testified during her deposition that students could choose not to learn Transcendental Meditation. She stated that although students who were disrupting others during Quiet Time may have been reprimanded by a teacher, an administrator, or the principal herself, she was not aware of any Bogan student being disciplined for choosing not to learn Transcendental Meditation. She also testified that she approved giving students at least two letters explaining Quiet Time to their parents and allowing their parents to opt out of the program, in accordance with the school's policy regarding student involvement in other school activities.

Sunita Martin, an independent contractor with DLF who was involved in implementing Quiet Time, similarly stated that students were given an "opt-out packet" and instructed to "take it home and give to their parent or guardian so that they could look it over and if their parent was not interested in them learning, then they would return that to us so we could know." Def.'s LR Stat. 56.1, Ex. 14 at 84:1–8. Students who were interested in learning Transcendental Meditation "could fill out a one-page form with their name, the classroom that they were in so that we could keep record of

4

who was interested and who was not." *Id.* at 84:11–14.  Various other employees of the University and DLF also testified that learning Transcendental Meditation was optional and that they did not witness any students being required to meditate during Quiet Time.

Williams signed the consent form and began learning Transcendental Meditation in October 2018.  He and other students who learned Transcendental Meditation participated in a training course for one hour each day over the course of four days.  On the first day of his training, Williams was present for a three-to-four-minute initiation ceremony.  The initiation took place at a classroom at Bogan.  It involved a Transcendental Meditation instructor placing assorted items in front of a painting of a man and speaking in Sanskrit.  The items varied from one initiation to the next, but could include flowers, fruit, a candle, rice, water, and sandalwood powder.  Williams testified that he mostly stood and observed the initiation, but at one point the instructor asked him to repeat words in a language that he did not understand.  He stated that when he asked what the words he repeated meant, the instructor informed him that those words did not have any meaning.  The instructor also gave Williams a "mantra" on his first day of training and instructed him to repeat it while meditating.  Williams said that the instructor told him the mantra "didn't have any meaning" and was a tool to help him relax during meditation.  He further testified that the "only thing [the Quiet Time staff] claim[ed]" over the course of the program was that "anything they were showing us had no deep significance to it or meaning behind it and just to do [it]." *Id.* at 118:23–119:3, 112:24–113:2.  Students who did not learn Transcendental Meditation were neither present for the initiation nor given a mantra.

On occasion throughout the 2018–19 school year, Transcendental Meditation instructors came to Williams's classroom and led him and other students through a meditation. During those sessions, the instructors rang a bell to start meditation, told the students to think of their mantra during the meditation, and rang another bell to end meditation. Not every student in Williams's class meditated during the instructor-led meditations, and Williams stated that he personally practiced Transcendental Meditation approximately twenty-five percent of the time during the fifteen-minute Quiet Time periods until the spring of 2019.

Around that time, substitute teacher Dasia Skinner approached Williams and informed him that she believed Transcendental Meditation was a religious practice. Williams testified that after speaking with Skinner—who was neither trained in Transcendental Meditation nor involved in implementing Quiet Time—and doing "his own research," he concluded that the mantra he received and the initiation ceremony were related to Hinduism. Williams also agreed, however, that the meditation instructors and Quiet Time program staff did not instruct him to "believe in a particular religion or particular deity." Williams Dep. at 112:4–11. Williams stopped practicing Transcendental Meditation after speaking with Skinner, and he graduated from Bogan when the school year ended on June 18, 2019. Williams brought this suit on August 3, 2020.

**Discussion**

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). There is a

6

genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (citation omitted).

## A.   Section 1983 claim

### 1.   Monell liability

The defendants seek summary judgment on the basis that Williams has failed to establish that either the Board or DLF are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). For his part, Williams has cross-moved for partial summary judgment "as to Allegations of Collaboration," Pls.' Mem. in Supp. of their Cross-mot. for Partial Summ. J. at 1, which the Court construes as a motion for partial summary judgment regarding DLF's liability under section 1983. Neither side is entitled to summary judgment on this basis.[2]

#### a.   The Board

"A court may not hold a government entity, such as a board of education, liable under § 1983 unless the entity adopted a policy or custom that resulted in the

---

[2] Williams's motion appears to encompass "Allegations of Collaboration" relating to the University as well, but he has no section 1983 claim against the University at this point. *See Separation of Hinduism*, 2021 WL 3633939, at *7 ("The claims that remain are the Williamses' section 1983 claims for damages against the Board and DLF and Amontae Williams's IRFRA claims against all three defendants."). Because Williams's IRFRA claim against all three defendants is time-barred, *see* Part B, *infra*, the Court need not decide his cross-motion as it relates to the University.

deprivation of the plaintiff's constitutional rights." *Bennett v. Roberts*, 295 F.3d 687, 699 (7th Cir. 2002). "To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [entity], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010).

Under Illinois law, "the School District's Board of Education has full power to manage the schools and to adopt all rules and regulations needed for that broad purpose." *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998) (citing 105 ILCS 5/10–20.5). Yet "[f]inal policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cty.*, 183 F.3d 734, 737 (7th Cir. 1999). The defendants admit that each school's principal "had the choice to implement Quiet Time." Defs.' LR 56.1 Stat. ¶ 19; *see also* Defs.' LR 56.1 Stat., Ex. 16, at 1582 (stating that "school principals have final authority over activities that are allowed to take place in the school."). The record also shows that Principal Aziz-Sims prepared at least two letters to parents regarding Quiet Time, announcing first the program for the 2017–2018 school year and then its expansion for the 2018–19 year. Consequently, "there remains a genuine issue of fact as to whether the Board had, as a matter of custom, delegated final policymaking authority to" school principals regarding the implementation of Quiet Time and introduction of Transcendental Meditation. *Kujawski*, 183 F.3d at 739.

Even if the Board had not delegated its authority, there is sufficient evidence in

the record for a reasonable jury to find that there was a widespread practice that would constitute a custom or usage. Although the defendants contend that Williams has failed to establish *Monell* liability because he has not identified an express policy by the Board, "[entity] liability under § 1983 is not conditioned on the existence of a written policy." *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). Rather, "[l]iability under § 1983 extends to any policy or custom that 'may fairly be said to represent official policy[,]'" and "[a] widespread practice may constitute an official policy with the force of law even though the practice itself is not reduced to written form." *Id.* (quoting *Monell*, 436 U.S. at 694). In this case, the Research Review Board within the Chicago Public Schools' Office of Accountability approved Quiet Time, and the Board executed a services agreement with DLF to implement the program and introduce Transcendental Meditation in at least two schools. When viewed in the light most favorable to Williams, this evidence "present[s] a triable issue of fact regarding whether there was a widespread practice" of implementing Quiet Time and Transcendental Meditation. *King*, 496 F.3d at 817.[3]

The Court therefore denies the defendants' motion for summary judgment as to *Monell* liability regarding the Board.

---

[3] The defendants also argue that Williams fails to establish *Monell* liability because the policy was not the "moving force" behind alleged injury, citing to *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020). But *J.K.J.* expressly held that "inferences of culpability and causation are easy" in cases involving an affirmative action by the entity, as those inferences "follow directly from the [entity]'s intentional decision to adopt the unconstitutional policy or custom or to take particular action" and "[d]eliberate conduct is easily inferred from the intentional adoption of the offending policy." *Id.* at 377. As a result, the Board and Principal's Aziz-Sims' intentional approval of Quiet Time is sufficient to amount to a "moving force" behind Williams's alleged injury.

### b.    DLF

Although DLF is a private entity, "the *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016).  "To prevail on his *Monell* claim, [a plaintiff] needs to show that [the private entity's] policy, practice, or custom, caused a constitutional violation."  *Id.*

The defendants argue that Williams has not pointed to a custom or policy of DLF's that violates his constitutional rights, and that he forfeited the argument by failing to address it in his response.  But Williams asserted in his response that "DLF and the Board reached an understanding" to deprive him of his constitutional rights, and he pointed out that "DLF, the University, and the Board entered into written agreements from 2015 to 2019 . . . to be granted access to Board students and their classrooms." Pls.' Resp. to Defs. Board and DLF's Mot. for Summ. J. on Pls.' Count I at 12. Furthermore, the defendants themselves state that DLF agreed in its contract with the Board to "deliver Quiet Time to students in CPS selected schools" and "hir[e] certified instructors as independent contractors to teach [Transcendental Meditation] to students in Quiet Time who had volunteered to learn."  Defs.' LR 56.1 Stat. ¶ 21, 27.  Even without evidence of an express or written policy, a reasonable jury could find based on this evidence that DLF had a policy of working with the Board to implement Quiet Time and Transcendental Meditation in various Chicago public schools, including Bogan.

In cases involving individual private defendants, the Seventh Circuit has held that under "the 'conspiracy theory' of § 1983 liability" an individual "can act under color of law if there is 'evidence of a *concerted effort* between a state actor and that individual.'"

*Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (quoting *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998)) (emphasis in original); *see also Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016) ("For a private actor to act under color of state law he must have 'had a 'meeting of the minds' and thus reached an understanding' with a state actor to deny plaintiffs a constitutional right.") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). "To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Fries*, 146 F.3d at 457. "Because § 1983 allows a private actor to be sued as if it were the state and makes state actors potentially liable as well, the state actor must share the private actor's unconstitutional goal in order for a state actor to be acting under color of state law." *Wilson*, 830 F.3d at 468.

Like an individual, a private entity acting pursuant to a policy or custom can also reach an understanding with a state actor to deprive an individual of her rights. The Court therefore sees no reason to limit the holding of *Spiegel* and *Wilson* regarding the "conspiracy theory" of § 1983 liability to individual private defendants, and *Wilson* in particular is instructive in this case. In *Wilson*, the Seventh Circuit rejected a plaintiff's § 1983 claim against private defendants because "[n]o evidence suggests that *any of the public defendants knew that the [state action] was unlawful* or that they *shared an unconstitutional goal* with the private [defendants]." *Wilson*, 830 F.3d at 468–69 (emphasis added). Applying *Wilson* here, DLF is liable under § 1983 if Williams can show that the Board knew the state action in this case—implementing Quiet Time and

teaching Transcendental Meditation—was unlawful or that the defendants shared an unconstitutional goal.

The defendants argue that Quiet Time was not unlawful and they had no unconstitutional goal. They point to the fact that (1) DLF's contract with the Board did not indicate that Transcendental Meditation was religious, and (2) its Quiet Time proposal described Transcendental Meditation as a "secular" and "extensively researched form of meditation." Defs.' LR 56.1 Stat. ¶ 9. Yet there is sufficient evidence for a reasonable jury to find that at least one state actor was aware of the potentially unlawful nature of parts of the Quiet Time program. A DLF employee admitted that he explained the initiation ceremony to Principal Aziz-Sims in one of their meetings, and Principal Aziz-Sims testified during her deposition that she learned Transcendental Meditation and witnessed an initiation ceremony as part of her meditation training. In particular, she stated that "the lights were turned down low[,] [t]here was a picture of the teacher who had taught them meditation, along with a piece of fruit and rice[,]" and she did not witness any "chanting in a language [she] did not understand." *Id.*, Ex. 17, at 9:20–10:5. Because, as discussed below, there is a genuine issue of material fact as to whether the implementation of the initiation ceremony violated the Establishment Clause, *see* Part A.2,a, *infra*, a reasonable jury could also find that Principal Aziz-Sims—who had decision-making authority regarding the implementation of Quiet Time at Bogan—was a state actor who was aware that Transcendental Meditation could have been unlawful. The record also indicates that DLF was familiar with the initiation ceremony, as the Quiet Time program ended at least in part because DLF refused to remove the ceremony, and this evidence could lead a

reasonable jury to find that DLF and Principal Aziz-Sims shared the potentially unconstitutional goal of instructing students in Transcendental Meditation.

The Court therefore denies the defendants' motion for summary judgment on Williams's section 1983 claim as it relates to DLF. To the extent that Williams intended to move for summary judgment on DLF's liability in his motion for partial summary judgment as to "Allegations of Collaboration," the Court denies the motion because a reasonable jury could find that there was no "meeting of the minds" or "concerted effort" between DLF and a state actor to infringe upon Williams's constitutional rights.[4]

### 2.    Merits

Williams contends that the defendants are liable under § 1983 because their implementation of Quiet Time violated the Establishment Clause and Free Exercise Clauses of the First Amendment. The defendants move for summary judgment on the basis that no reasonable jury could find that Quiet Time is a First Amendment violation, and Williams appears to cross-move for partial summary judgment on liability.[5] The Court denies both motions because there is a genuine dispute of material fact and a reasonable jury could—but is not guaranteed to—find that Quiet Time violated the First

---

[4] To the extent that Williams contends that partial summary judgment in his favor is warranted because his memorandum "contains sufficient allegations of collaboration and joint participation" and "proper allegations under 42 U.S.C. Section 1983," Pls.' Reply Br. in Supp. of their Cross-mot. for Summ. J. at 2, 6, that is not the law. Summary judgment does not depend on the sufficiency of a party's allegations, but instead is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

[5] Williams refers to his motion as a "Cross-Motion for Partial Summary Judgment as to Collaboration and Religion in Counts One and Two of Plaintiff['s] Second Amendment" and argues that the Court should grant partial summary judgment on "the Religion Claims." Pls.' Mem. in Supp. of Cross-mot. for Partial Summ. J. at 1, 7.

Amendment.

### a. Establishment Clause

The First Amendment states that "Congress shall make no law respecting an establishment of religion[.]"  U.S. Const. am. I.  In *Kennedy v. Bremerton School District*, the Supreme Court overruled the test articulated by *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and held that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  142 S. Ct. 2407, 2428 (2022) (quoting *Town of Greece v. Galloway,* 572 U.S. 565, 576 (2014)).  In particular, the Court stated in *Kennedy* that the distinction between permissible and impermissible activities under the Establishment Clause must "accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers."  *Id.* (internal citations and quotation marks omitted).

The defendants contend that Williams has failed to satisfy *Kennedy*'s "historical practices and understandings" test.  They point out that Williams at most distinguishes *Kennedy* on the facts but does not discuss or analyze any historical practices relating to allegedly religious activities in public schools.  Yet a historical analysis is not necessary in this case.  The Court stated in *Kennedy* that it did not overrule prior decisions in which "[the Supreme Court] has found prayer involving public school students to be problematically coercive."  *Kennedy*, 142 S. Ct. at 2431 (distinguishing *Lee v. Weisman*, 505 U.S. 577 (1992) and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000)).  And the Court stated that it "has long held that government may not, *consistent with a historically sensitive understanding of the Establishment Clause*, 'make a religious observance compulsory.'"  *Kennedy*, 142 S. Ct. at 2429 (emphasis added).  A

state actor therefore "may not coerce anyone to attend church" or participate in "a formal religious exercise," and "coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* (citing *Lee v. Weisman*, 505 U.S. 577, 640–642 (1992)).

The Seventh Circuit has recognized that one test for evaluating Establishment Clause challenges "is known as the 'coercion' test[,]" and "[t]he Supreme Court has applied this test in school prayer cases." *Woodring v. Jackson County*, 986 F.3d 979, 988 (7th Cir. 2021) (citing *Lee*, 505 U.S. 577). *Kennedy*'s extensive discussion of coercion indicates that this test is still good law, as the decision makes it clear that compulsory prayer or other religious activities in schools do not align with this country's historical practices and understandings. Although "[the Supreme Court] has long recognized as well that 'secondary school students are mature enough . . . to understand that a school does not endorse,' let alone coerce them to participate in, 'speech that it merely permits on a nondiscriminatory basis[,]'" there is also a "traditional understanding that *permitting private speech is not the same thing as coercing others to participate in it*." *Kennedy*, 142 S. Ct. at 2430, 2431 (quoting *Bd. of Educ. of Westside Cmty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion)) (emphasis added). To the extent that a school program or activity that causes "some [to] take offense to certain forms of speech or prayer they are sure to encounter in a society where those activities enjoy such robust constitutional protection[]" does not violate the Establishment Clause, the Supreme Court expressly stated that this was because "[o]ffense . . . does not equate to coercion." *Id.* (quoting *Town of Greece*, 572 U.S. at 589).

In applying the "coercion" test, the Seventh Circuit appears to have considered several factors, including whether (1) the school "had a captive audience on its hands," (2) there was any "religious activity in which [students] had to partake," and (3) students "felt pressured to support the religious aspects of the [activity] when they saw others . . . reflecting on the religiosity of the [activity.]"  *Freedom from Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038, 1048–49 (7th Cir. 2018).  A state actor need not "act with a religious motive in order to fail the coercion test" when it conducts a school activity "in an indisputably religious setting" or chooses to "affirmatively to involve religion in [a] mandatory [activity]."  *Knudtson v. County of Trempealeau*, 982 F.3d 519, 527–28 (7th Cir. 2020) (citing *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 844 (7th Cir. 2012) (en banc)).  Because there is sufficient evidence to permit a reasonable jury to find in Williams's favor on each of these considerations, the defendants are not entitled to summary judgment on this point.

A reasonable jury could find that the school had a "captive audience" for both the Quiet Time program overall and the Transcendental Meditation initiation ceremony.  The defendants do not dispute that Quiet Time was part of the school schedule at Bogan, and students who did not practice Transcendental Meditation were nonetheless present in classrooms when instructor-led meditation occurred.  Nothing in the record suggests that students who did not meditate during Quiet Time could leave the classroom or go elsewhere for those fifteen minutes, and Williams testified that an instructor took him to a separate classroom to witness the initiation ceremony.  There is conflicting testimony regarding whether it was optional for students to learn Transcendental Meditation and thus experience the initiation.  Williams stated during his deposition that it was

16

mandatory to sign up to learn Transcendental Meditation, but Principal Aziz-Sims, DLF contractor Sunita Martin, and various other University and DLF employees testified that learning and practicing Transcendental Meditation was optional for students. Because "district courts presiding over summary judgment proceedings may not 'weigh conflicting evidence,' or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal citations omitted), the conflicting testimony of the various witnesses is sufficient to create a genuine factual dispute on whether there was a captive audience for at least the initiation ceremony.

That dispute aside, a reasonable jury could find that the program included a "religious activity in which [students] had to partake[.]" *Concord Cmty. Schs.*, 885 F.3d at 1049. Specifically, there is evidence that a Transcendental Meditation instructor separated Williams from his classmates and brought him individually to a different classroom for the initiation. A reasonable jury could find that Williams, having arguably signed up to be trained in Transcendental Meditation, was then *required* to observe a religious ceremony in order to learn meditation and was misled about the ceremony's religious nature. The scenario as presented by Williams differs from the school prayer cases and the situation in *Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979), because there was no imposition or mention of any specific beliefs by the defendants. But the initiation ceremony distinguishes this situation from those cases involving the simple practice of Yoga in schools. *See Sedlock v. Baird*, 235 Cal. App. 4th 874, 892-99 (2015); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 65 (2d Cir. 2001).[6] The evidence in this record—

---

[6] The defendants contend that the Court should not focus on "a one-time, three-minute expression of gratitude the instructor performed[,]" citing to the Supreme Court's statement that "[f]ocus exclusively on the religious component of any activity would

17

most notably the details of the initiation ceremony—suggest that a reasonable jury could find that the Transcendental Meditation training as implemented was religious in nature or at least included a required religious ceremony.

Lastly, the Seventh Circuit considered in *Concord* whether students "felt pressured to support the religious aspects of the [activity] when they saw others . . . reflecting on the religiosity of the [activity]" in deciding whether a school activity was coercive. *Concord Cmty. Schs.*, 885 F.3d at 1049. A reasonable jury could find that Williams felt pressured to support the purportedly religious aspects of Transcendental Meditation during the initiation ceremony, when he saw various items placed around a picture of a teacher of Transcendental Meditation while the instructor spoke in a language he did not understand. It is less clear whether Williams would have felt pressured to support the instructor-led meditation in the classrooms, as he conceded that he could not tell whether other students were meditating or "reflecting on the religiosity" of the meditation. There is a genuine factual dispute on this point.

For the reasons stated above, the Court denies the defendants' motion for summary judgment on the ground that there is no Establishment Clause violation. To the extent that Williams intended to move for summary judgment on his Establishment Clause claim via the section of his motion for partial summary judgment concerning his "Religion claims," the Court denies the motion. The reason is that a reasonable jury

---

inevitably lead to its invalidation under the Establishment Clause." Defs.' Reply Br. in Supp. of Summ. J. Mot. on Counts I and II at 6 (quoting *Lynch v. Donnelly*, 465 U.S. 668 (1984)). Yet the statement in *Lynch* was in reference to a nativity scene in the context of a Christmas display, and the Supreme Court held post-*Lynch* that even a two-minute prayer was sufficient to violate the Establishment Clause. *Lee*, 505 U.S. at 594.

could find that there was no "captive audience," that the initiation ceremony was not religious in nature, or that Williams did not feel pressured to support any religious aspects of the program.

### b. Free Exercise Clause

Williams contends that the defendants violated the Free Exercise Clause in addition to the Establishment Clause at various points in his briefing, but he does not engage in a Free Exercise Clause analysis or mention the governing law on this issue. In their motion for summary judgment, the defendants pointed out that "[t]he free exercise analysis begins with an inquiry into whether the law at issue is neutral and generally applicable[]" and that "[a] law is not neutral if 'the object of the law is to infringe upon or restrict practices because of their religious motivation." Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. on Pls.' Count I at 17 (citing *Vision Church v. Vill. of Long Grove*, 468 F.3d 975 (7th Cir. 2006) and *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007)). Yet Williams did not respond to the defendants' contention that there is no Free Exercise Clause violation or explain why he believed Quiet Time was not neutral or generally applicable. The Court therefore concludes that Williams has abandoned his Free Exercise claim, grants the defendants' motion for summary judgment as it relates to this claim, and denies Williams's motion for partial summary judgment as to the "Religion claims" to the extent that it applies to this claim. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (plaintiff abandoned claim by failing to address it in his opposition to summary judgment); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").

19

### 3. Damages

The defendants also move for summary judgment on the basis that Williams has failed to prove damages as required for § 1983 claims. The Court denies the motion because Williams has not disclaimed money damages and he has sufficiently established his emotional distress injury.

The defendants rely on Williams's statement in his deposition that he is "not hoping for money in this lawsuit," Williams Dep. 310:16, and they cite to three nonprecedential, out-of-circuit decisions to argue that he has waived his right to money damages, including nominal damages. But the Court is not convinced that a single remark that Williams is not "hoping for" money demonstrates a knowing waiver of his right to damages, and there is no other evidence in the record suggesting that Williams intended to disclaim the only relief he can recover in this case. Rather, he stated in his amended complaint that he was seeking "compensatory damages for the mental anguish and emotional distress" and "nominal damages for violations of [his] constitutional rights." Second Am. Class Compl. ¶ 125. The Court therefore declines to conclude that Williams has disclaimed money damages, and "at a minimum, a plaintiff who proves a constitutional violation is entitled to nominal damages." *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003).

In the alternative, the defendants move for summary judgment on compensatory damages, arguing that Williams has not provided sufficient proof of emotional damages. There is no evidence that Williams sought medical or mental health care as a result of his alleged distress from the Quiet Time program, but "an injured person's testimony may, by itself or in conjunction with the circumstances of a given case, be sufficient to

establish emotional distress without more."  *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000).  "The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress."  *Stevens v. Hous. Auth. of S. Bend, Indiana*, 663 F.3d 300, 308 (7th Cir. 2011) (quoting *United States v. Balistrieri*, 981 F.2d 916, 932 (7th Cir. 1992)).  However, "[w]hen the injured plaintiff's testimony is the only proof of emotional damages, [he] must explain the circumstances of [his] injury in reasonable detail; [he] may not rely on conclusory statements."  *Stevens*, 663 F.3d at 308 (citing *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003); *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000)).

Williams testified that he experienced mental health challenges and suicidal thoughts prior to participating in the Quiet Time program, but that Transcendental Meditation made his struggles worse.  When asked to explain how his condition worsened, Williams stated that "not many know about it, but like I killed a couple animals, I was getting in trouble for starting fires in people's garages, trash every in the alley on fire[.]"  *Id.* 210:19–22.  He then appeared to clarify that he was referring to animals he had harmed before he learned Transcendental Meditation, but viewing this testimony in Williams's favor as the non-movant, the Court concludes that Williams has described his emotional distress injury in "reasonable detail."  *Stevens*, 663 F.3d at 308.  Furthermore, if a jury concludes that Transcendental Meditation was a religious practice and that Williams was coerced into learning it, that jury could also reasonably conclude that the experience would be "inherently degrading or humiliating" and accept Williams's

more conclusory statements as proof of his emotional distress injury. *Id*.

For the above reasons, the Court denies the defendants' motion for summary judgment regarding damages on his § 1983 claim.

**B.      IRFRA claims**

The defendants move for summary judgment on the IRFRA claims, contending that they are time-barred by the Illinois Tort Immunity Act's one-year statute of limitations.  The Court agrees and grants the motion in this regard.

In its prior opinion on the defendants' motion to dismiss, the Court held that "due to the Board's status as a governmental entity, the IRFRA claim against the Board is subject to a one-year statute of limitations."  *Separation of Hinduism*, 2021 WL 2036536, at *41 (citing *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (per curiam).  The Court did not grant the motion to dismiss the IRFRA claim at that point because "[t]he plaintiffs allege that the implementation of the Quiet Time program amounted to a continuous violation, but their complaint lacks (and, as indicated, need not include) the information necessary to determine this definitively. The Court declines to dismiss the complaint on this basis without the benefit of a complete factual record." *Separation of Hinduism*, 2021 WL 2036536, at *42.

Reviewing the complete factual record presented by the parties on summary judgment, the Court notes that it is undisputed that Williams witnessed the initiation ceremony on October 15, 2017 and graduated from Bogan on June 18, 2019.  Because his participation in Quiet Time and Transcendental Meditation ended on June 18, 2019 at the latest, the one-year statute of limitations ran until June 18, 2020.  Yet Williams did not bring his suit until almost two months later, on August 3, 2020.  Williams's only

response is that his IRFRA claims are not time-barred "by analogy to federal law" because the statute of limitations for his § 1983 claims is two years. He provides no further support or explanation for this argument, and "perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." *Mahaffey*, 588 F.3d at 1146.

Consequently, the Court grants the defendants' motion for summary judgment on Williams's IRFRA claims against all three defendants.

## Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of the defendants on the IRFRA claims and denies the defendants' motion for summary judgment [dkt. no. 214] on Williams's § 1983 claim. The Court denies Williams's motion for partial summary judgment [dkt. no. 226]. The case is set for a telephonic status hearing on May 31, 2023 at 8:45 a.m. The following call-in number will be used: 888-684-8852, access code 746-1053.

Date: May 16, 2023

_____
MATTHEW F. KENNELLY
United States District Judge